HANSON BRIDGETT LLP
DAVINA PUJARI, SBN 183407
dpujari@hansonbridgett.com
CHRISTOPHER A. RHEINHEIMER, SBN 253890
crheinheimer@hansonbridgett.com
SAMIR J. ABDELNOUR, SBN 271636
sabdelnour@hansonbridgett.com
MELISSA M. MALSTROM, SBN 314012
mmalstrom@hansonbridgett.com
425 Market Street, 26th Floor
San Francisco, California 94105
Telephone:     (415) 777-3200
Facsimile:     (415) 541-9366

Attorneys for Plaintiff
TETRA TECH EC, INC.

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| TETRA TECH EC, INC., | Case No. |
| Plaintiff, | **COMPLAINT FOR:** |
| v. | **(1) NEGLIGENCE** |
| CH2M HILL, INC., BATELLE MEMORIAL INSTITUTE, CABRERA SERVICES, INC., PERMAFIX ENVIRONMENTAL SERVICES, INC., and SC&A, INC., | **(2) NEGLIGENT MISREPRESENTATION** |
| | **(3) EQUITABLE INDEMNIFICATION** |
| Defendants. | **DEMAND FOR JURY TRIAL** |

COMPLAINT

## I.   INTRODUCTION

1.      In 2016, the United States Navy, faced with public pressure arising from inconsistent and unsupported allegations by a group of self-proclaimed "whistleblowers," made the unfortunate decision to hire a group of high-priced and unqualified consultants to review environmental data collected by Tetra Tech EC, Inc. (TtEC or Plaintiff), a reputable and experienced environmental firm, at Hunters Point Naval Shipyard (Hunters Point or the Site). The Defendant consultants, direct competitors of Plaintiff, applied a series of arbitrary, unscientific, and inexplicable criteria to review Plaintiff's data, and then incorrectly concluded that "potential" data manipulation or falsification occurred throughout the Site. The Defendant consultants produced a series of draft reports which contain demonstrably invalid findings that have no basis in science, statistics, contract, or environmental law, and that are based upon incorrect assumptions and unproven methodologies. The draft reports were made public and have since become the center of a massive, unfounded controversy concerning Hunters Point.

2.      The draft reports, which are the epitome of junk science, have taken on a life of their own. They have damaged Plaintiff's reputation considerably. The Defendant consultants will reap over $14 million for their shoddy work, which applies faulty criteria to environmental data that were collected, analyzed, and applied in accordance with governing contracts and specifications under strict regulatory oversight. In fact, the faulty criteria applied by the Defendant consultants to review Plaintiff's work are so inappropriately outcome-oriented, and the conclusions drawn so preconceived, that their application to data from *any* environmentally impacted site would result in a similar determination of "potential" data manipulation or falsification, thereby casting doubt on countless environmental cleanups around the country.

3.      Throughout their purported "data evaluation" process, the Defendant consultants knew that they stood to gain significant economic benefits should Plaintiff's data be labeled suspect or unreliable, because they then would be hired to re-do Plaintiff's work, regardless of whether any rework was necessary, and even if it constituted an egregious waste of time and resources. Enticed by this windfall, the consultants gamed their analysis to carelessly, erroneously, and without foundation conclude that Plaintiff's data had been potentially manipulated and/or

16699886.1

falsified. The Defendant consultants' work was negligent; they made numerous misrepresentations and cast spurious aspersions on robust and accurate environmental data. Plaintiff's reputation and business have been harmed by Defendants' tortious acts, and Plaintiff now seeks redress from this Court.

## II.    JURISDICTION

4.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the conduct giving rise to this action occurred in part on a federal enclave at Hunters Point.

## III.    VENUE

5.      Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, because the property that is the subject of this action is situated in this District, and a substantial portion of the events giving rise to this claim occurred in the District.

## IV.    PARTIES

6.      Plaintiff Tetra Tech EC, Inc. (TtEC or Plaintiff) is an environmental construction company incorporated in Delaware, with its principal place of business in San Diego, California. Plaintiff is a subsidiary of Tetra Tech, Inc. Plaintiff and its predecessor conducted remediation and construction work at Hunters Point during the period of 2002 to 2016.

7.      Defendant CH2M Hill, Inc. (CH2M) is an engineering and consulting company incorporated in Florida, with its principal place of business in Englewood, Colorado. CH2M contracted with the United States Navy (Navy) to assess whether radiological remedial actions performed by Plaintiff at Hunters Point were adequately completed to ensure there are no unacceptable human health impacts from radioisotopes of concern, to evaluate radiological remediation data collected by Plaintiff at Hunters Point, to provide confirmation testing in areas where Defendants determined Plaintiff's data was potentially unreliable, and to repeat Plaintiff's remediation work where the Navy determined it was necessary based on Defendants' conclusions.

8.      Defendant Battelle Memorial Institute (Battelle) is a global research and development organization headquartered in Columbus, Ohio. Battelle contracted with the Navy and/or subcontracted with CH2M to provide and/or assist with an assessment of whether radiological remedial actions completed by Plaintiff at Hunters Point were adequately completed

COMPLAINT

16699886.1

to ensure there are no unacceptable human health impacts from radioisotopes of concern, to evaluate radiological remediation data collected by Plaintiff at Hunters Point, to provide confirmation testing in areas where Defendants determined Plaintiff's data was potentially unreliable, and/or to repeat Plaintiff's remediation work where the Navy determined it was necessary based on Defendants' conclusions.

9.     Defendant Cabrera Services Inc. (Cabrera) is a provider of environmental and radiological services. Cabrera is incorporated in Connecticut and its principal place of business is located in East Hartford, Connecticut. Cabrera contracted with the Navy and/or subcontracted with CH2M to provide and/or assist with an assessment of whether radiological remedial actions completed by Plaintiff at Hunters Point were adequately completed to ensure there are no unacceptable human health impacts from radioisotopes of concern, to evaluate radiological remediation data collected by Plaintiff at Hunters Point, to provide confirmation testing in areas where Defendants determined Plaintiff's data was potentially unreliable, and/or to repeat Plaintiff's remediation work where the Navy determined it was necessary based on Defendants' conclusions.

10.    Defendant PermaFix Environmental Services, Inc. (PermaFix) is a nuclear services and waste management company incorporated in Delaware. Its principal place of business is in Atlanta, Georgia. PermaFix contracted with the Navy and/or subcontracted with CH2M to provide and/or assist with an assessment of whether radiological remedial actions completed by Plaintiff at Hunters Point were adequately completed to ensure there are no unacceptable human health impacts from radioisotopes of concern, to evaluate radiological remediation data collected by Plaintiff at Hunters Point, to provide confirmation testing in areas where Defendants determined Plaintiff's data was potentially unreliable, and/or to repeat Plaintiff's remediation work where the Navy determined it was necessary based on Defendants' conclusions.

11.    Defendant SC&A Inc. (SC&A) is an environmental and energy consulting company incorporated in Virginia, with its principal place of business in Arlington, Virginia. SC&A contracted with the Navy and/or subcontracted with CH2M to provide and/or assist with an assessment of whether radiological remedial actions completed by Plaintiff at Hunters Point were

16699886.1

adequately completed to ensure there are no unacceptable human health impacts from radioisotopes of concern, to evaluate radiological remediation data collected by Plaintiff at Hunters Point, to provide confirmation testing in areas where Defendants determined Plaintiff's data was potentially unreliable, and/or to repeat Plaintiff's remediation work where the Navy determined it was necessary based on Defendants' conclusions.

## V.      FACTS

**A.      HUNTERS POINT NAVAL SHIPYARD**

12.      Hunters Point borders San Francisco Bay in the Southeast portion of the City of San Francisco. It comprises over 900 acres, approximately half of which are submerged. Some of the currently existing dry lands were reclaimed from San Francisco Bay beginning in the late 1800s, and consist largely of fill materials taken from open land and hills in the area, and other locations in and around San Francisco Bay. The fill material also include dredge spoils and demolition debris.

13.      The Navy obtained the Hunters Point parcels through a series of purchases and condemnations beginning in or about 1940, and the United States accepted federal jurisdiction over the land pursuant to the U.S. Constitution and California law.

14.      The Navy operated a naval base at Hunters Point from approximately 1940 until the base was deactivated in or about 1974. Private companies operated on portions of the property and within structures at the Site before and after its use as a naval base. In 1986, the Navy briefly resumed operation of a shipyard at Hunters Point, as an annex to Naval Station Treasure Island. Shipyard operations permanently ceased at the Site in 1989. In 1991, Hunters Point was placed on the Navy's Base Realignment and Closure (BRAC) list and slated for closure.

15.      During the Site's use as a naval base, radioactive materials were used on base to support Navy operations, including in support of the war effort during World War II, and for research purposes by the Navy's Radiation Laboratory and Naval Radiological Defense Laboratory. Radioactive materials were used to refurbish and handle radioluminescent devices, in gamma radiography, and to calibrate radiation detection instruments. The Navy also decontaminated radiologically-contaminated naval ships at Hunters Point and undertook research

16699886.1

on radiological decontamination and human and animal health effects.

16.     In 2004, the Naval Sea Systems Command (NAVSEA) published the Hunters Point Shipyard Final Historical Radiological Assessment, History of the Use of General Radioactive Materials 1939–2003, which documents the full history and use of radioactive materials at the Site.[1]

17.     In addition to the radiological contamination present at the Site due to the Navy's activities, the Navy also contaminated soil, dust, sediments, surface water, and groundwater with petroleum fuels, pesticides, heavy metals, polychlorinated biphenyls (PCBs), and volatile organic compounds (VOCs). Soils present at the Site also contain naturally occurring radionuclides, asbestos, and metals.

18.     As a result of the contamination present at the Site due to the Navy's operations, the Site was added to the Comprehensive Environmental Response Compensation and Liability Act (CERCLA), also known as Superfund, National Priorities List on November 21, 1989.

19.     Hunters Point was thereafter slated for cleanup and included in the Navy's Installation Restoration Program (IRP), whereby the Department of Defense seeks to identify, investigate, and clean up contamination of hazardous materials at military sites throughout the country. The Site was divided into alphanumerically-named Parcels to facilitate cleanup.

20.     Because the Site is federally owned, the cleanup is governed by 42 U.S.C. § 9620. The Navy is the lead agency responsible for the investigation and cleanup of the Site. The Environmental Protection Agency (EPA) and the State of California, through the California Department of Toxic Substance Control (DTSC) and San Francisco Regional Water Quality Control Board, oversee and enforce the Navy's cleanup actions. The coordination between the Navy, EPA, and the State of California is governed by a Federal Facility Agreement, effective January 22, 1992.[2]

21.     The Navy's BRAC Program Management Office (BRAC PMO) (a division of the

---

[1] The full report is available for download here:
https://www.bracpmo.navy.mil/content/dam/bracpmo/california/former_naval_shipyard_hunters_point/pdfs/all_documents/environmental_documents/radiological/hps_200408_hra.pdf
[2] The Federal Facility Agreement for Hunters Point is available here:
https://www.navfac.navy.mil/niris/SOUTHWEST/HUNTERS_POINT_NS/N00217_005218.PDF

16699886.1

1  Naval Facilities Engineering Command (NAVFAC)), manages the cleanup at Hunters Point with

2  assistance from the Navy's Radiological Affairs Support Office (RASO).

3  **B.      TETRA TECH EC, INC.'S REMEDIATION ROLE AT THE SHIPYARD**

4       22.    Plaintiff's predecessor was awarded its first contract for remediation and

5  construction work at Hunters Point in 2002, and subsequent contracts followed, including those

6  relating to radiological surveys and remediation.

7       23.    Plaintiff's predecessor was awarded its first Hunters Point radiological contract

8  task order in 2003. At that time, New World Environmental, dba New World Technology (New

9  World) was the primary radiological contractor performing radiological investigations and

10  remedial work at the Site, having worked there since approximately the late 1990s. The Navy

11  instructed Plaintiff that New World was the only subcontractor approved by the Navy to perform

12  radiological tasks at the Site. Plaintiff hired New World as its radiological subcontractor at the

13  Navy's direction. From 2003 until March 30, 2009, all radiological work at Hunters Point was

14  performed under New World's radiological materials license.

15       24.    Plaintiff invoked its radiological materials license at the Site in 2009 due to

16  performance and quality control issues associated with New World. However, at Navy RASO's

17  recommendation, Plaintiff hired a number of New World employees to maintain personnel

18  continuity at Hunters Point.

19       25.    Plaintiff's work at the Site was closely overseen at all times by Navy RASO,

20  BRAC, and regulatory agencies including EPA, DTSC, and the California Department of Public

21  Health (CDPH).

22  **C.      ANOMALOUS SAMPLING, INVESTIGATION, AND CORRECTIVE ACTIONS**

23       26.    In 2012, during a routine telephone call with Plaintiff, a Navy RASO official

24  expressed concerns about certain results in Plaintiff's soil sampling data. Final systematic samples

25  at one location (Building 517) appeared to report lower than expected Potassium-40 levels.

26  Potassium-40 is not a contaminant of concern at the Site, but rather is a naturally occurring

27  radioisotope present throughout Hunters Point. Plaintiff thereafter conducted an extensive

28  investigation in close consultation with the Navy to determine the cause of the anomalous

-7-

**COMPLAINT**

1   sampling results.

2        27.    Plaintiff summarized the initial investigation in a report entitled "Investigation

3   Conclusion Anomalous Soil Samples at Hunters Point Naval Shipyard." The first draft of the

4   report was submitted to the Navy on November 29, 2012, and to the Nuclear Regulatory

5   Commission (NRC) on December 3, 2012. The report was finalized in April 2014, after extensive

6   discussions with the Navy, and after Plaintiff had responded to and addressed multiple rounds of

7   comments on the report.

8        28.    Although no employees or subcontractors admitted to any improper sampling,

9   despite repeated questioning, Plaintiff determined that the likely cause of the issue was that certain

10  individuals had not collected soil from the locations identified on chain-of-custody records.

11  Plaintiff discussed the likely cause in the investigation report.

12       29.    During and following the investigation, Plaintiff implemented multiple corrective

13  actions, in consultation with the Navy, to address the issues identified and to ensure accuracy of

14  future sampling. Plaintiff developed procedures to immediately identify and escalate any atypical

15  sample results. Plaintiff instituted additional training on sampling protocols and ethics, and

16  increased quality control surveillance. Plaintiff carefully reviewed all historical samples that

17  showed inconsistencies with prior results, in coordination with the Navy. The technicians

18  associated with the irregular samples were permanently removed from projects at Hunters Point.

19  New samples were collected to replace the irregular, rejected samples. One draft remediation

20  report was revised, and subsequent remediation reports were written to address the irregular

21  samples and evaluate site conditions based only on new or validated sample results. No

22  investigation or remediation decisions were made based on the irregular, rejected samples. All of

23  this was done in close coordination with the Navy, at Plaintiff's expense. Plaintiff did not bill the

24  Navy for any of this work.

25       30.    Plaintiff's investigation continued after the 2014 report was submitted. With the

26  Navy's input, Plaintiff continued to evaluate previously surveyed units and addressed all issues

27  that arose during the course of the investigation.

28       31.    In total, Plaintiff and the Navy, working in close coordination, investigated 30

survey units with potentially anomalous data and corrected all identified issues.

32.     Plaintiff did not identify any other anomalous sampling following its investigation and corrective actions.

33.     The Navy accepted Plaintiff's corrective actions and presented Plaintiff's investigation report to the regulatory agencies in July 2014.

34.     In 2013 and 2014, the Navy issued positive contractor performance evaluations of Plaintiff's work, with full knowledge of the issues identified in October 2012 and during Plaintiff's investigation. While the Navy noted that the issues had caused some delay, there was no indication that the Navy mistrusted the remainder of Plaintiff's work.

35.     Following Plaintiff's initial investigation in 2012, the Navy awarded Plaintiff four additional contract task orders and numerous contract modifications for continuing remediation work to be performed at Hunters Point. The Navy continued to pay Plaintiff for the work it performed, and there was no indication over the course of the next several years that the Navy was dissatisfied with any of Plaintiff's work at the Site.

36.     In a January 2017 Fact Sheet,[3] the Navy agreed that after Plaintiff's investigation, and "the new sampling and cleanup work was complete, independent analysis of the final data confirmed that radiological contamination had, in fact, been cleaned up properly."

37.     In 2017, two former employees of Plaintiff pleaded guilty to destruction, alteration, or falsification of records in violation of 18 U.S.C. § 1519, for their roles in the irregular sampling. Plaintiff's investigation and corrective actions addressed all areas that were the subject of the plea agreements. No other individuals or entities were criminally prosecuted in connection with the anomalous data.

38.     Plaintiff's work at the Site was done appropriately. The data collected are reliable and demonstrate, pursuant to the standards set by the Navy, that there are no unacceptable risks to human health or the environment due to the presence of radionuclides in the areas where Plaintiff performed remediation.

_____

[3] This Fact Sheet is available for download at https://www.bracpmo.navy.mil/brac_bases/california/former_shipyard_hunters_point/documents1.html#Radiological.

COMPLAINT

**D.      NUCLEAR REGULATORY COMMISSION (NRC) INVESTIGATION**

39.     The NRC also investigated the anomalous sampling after Plaintiff voluntarily provided its investigation report to the agency in 2012. The NRC's investigation, which lasted over a year and included interviewing a number of individuals associated with the anomalous sampling events and their onsite managers, determined that two individuals, acting outside of Plaintiff's established protocols, gathered samples from areas other than where the samples were identified as having originated.

40.     The NRC's investigation results were consistent with the investigation performed by Plaintiff in coordination with the Navy.

41.     The NRC concluded that Plaintiff's management was not involved in the data falsification engaged in by these two individuals.

42.     The NRC did not identify any further sampling issues associated with Plaintiff's work during the course of its investigation.

**E.      FALSE CLAIMS ACT CASES**

43.     Beginning in or about 2013, former subcontractor employees came forward, filing a False Claims Act case under seal, and alleging wrongdoing by Plaintiff's employees and subcontractors working at Hunters Point. The False Claims Act case, if successful, would result in a substantial monetary award to the complainants. The allegations encompass a wide variety of purported wrongdoing. Some allegations derive from misunderstandings of technical requirements, while others relate to alleged wrongful discharge and employment claims, many of which were already investigated and found to lack merit.

44.     In 2016, additional complainants, represented by the same attorney, came forward with additional allegations relating to remediation and construction work allegedly performed by Plaintiff, Tetra Tech, Inc., and Shaw Environmental and Infrastructure, Inc. at Hunters Point, Treasure Island Naval Station, and Alameda Naval Station. These allegations cover a wide variety of time periods, purported misconduct, and in many instances stem from an alleged investigation undertaken by Anthony Smith, a former New World employee, and his attorney several years after Mr. Smith was removed from his position at Hunters Point.

45.     Notably, Mr. Smith, a long-time employee of New World, was implicated in the anomalous sampling issues that Plaintiff investigated and corrected, and has himself admitted to switching soil samples and falsifying sample records, but to date he has not been prosecuted by the government.

46.     In the fall of 2018, the Department of Justice intervened in some of the complainants' False Claims Act actions with respect to some of the allegations made relating to Hunters Point. The False Claims Act litigation is ongoing.

## F.     EVALUATION OF PLAINTIFF'S REMEDIATION DATA

47.     In or about 2016, purportedly in response to the additional allegations made by the False Claims Act complainants, the Navy assembled a "Technical Team" (also known as the Hunters Point Tiger Team) to conduct an evaluation of radiological data collected by Plaintiff while conducting remediation at Hunters Point. The Technical Team includes representatives from the Navy, EPA, DTSC, CDPH, the City of San Francisco, and Oregon State University.[4]

48.     Thereafter, the Navy contracted with another team to perform an evaluation and confirmation investigation of Plaintiff's radiological data, which consisted of Battelle, Cabrera, CH2M, PermaFix, and SC&A (together, Defendants or Evaluation Team).

49.     CH2M was selected as the primary contractor to perform the evaluation of Plaintiff's data, despite the fact that CH2M was previously hired by a land developer to provide asbestos monitoring at Hunters Point and bungled its monitoring responsibilities. Many months' worth of CH2M monitoring results could not be confirmed, resulting in the developer receiving approximately a half million dollar fine due to CH2M's misconduct. CH2M's radiological remediation subsidiary was also embroiled in a False Claims Act scandal for submitting false claims to the government and paying kickbacks relating to a contract for management, maintenance, and cleanup of radioactive and hazardous waste at the Hanford Site in Washington State.

---

[4] Unless otherwise noted, the allegations in this Complaint concerning the acts, omissions, and knowledge of CH2M, Battelle, Cabrera, PermaFix, SC&A, EPA, DTSC, CDPH, the City of San Francisco, Oregon State University, and the Navy are made on information and belief.

50.     The Navy awarded CH2M contract N62470-16-D-9000, on or about January 14, 2016, and Contract Task Order FZ 12, dated November 15, 2016. The primary objective of the task order is to "assess whether radiological remedial actions conducted at HPNS have been adequately completed to ensure there are no unacceptable human health impacts from radioisotopes of concern at [Hunters Point] CERCLA sites." A basic component of the CH2M scope of work was "to evaluate the integrity of data collected during past radiological investigation and cleanup activities at HPNS and determine if, where, and how follow-up data should be collected to validate remedial decisions regarding the current property condition." In other words, the objectives were to evaluate Plaintiff's radiological data, identify any areas where further confirmation and/or remediation was required, and to complete that work where CH2M determined it was necessary. The contract also required that deliverables, including reports, be "concise, clear and complete."

51.     CH2M's original contract award totaled $100,000 but has since been modified five times, ballooning to more than 143 times its original size, to a total contract award in the amount of $14,340,074.13. Unfortunately, the Navy wasted over 14 million taxpayer dollars on a biased, unscientific, and incorrect assessment of the data Plaintiff collected at Hunters Point—an assessment that did not follow the requirements set forth in CH2M's contract with the Navy.

52.     On December 13, 2016, representatives of the Technical Team, along with stakeholders in the future redevelopment project at Hunters Point, including a representative from developer Five Point Holdings, LLC,[5] met to discuss the data evaluation and its objectives. It was determined that all of Plaintiff's data from 2006 onward would be evaluated by running "statistical tests." Concerns were expressed at this meeting about the validity of data that did not show any obvious anomalies. Lily Lee, a representative from the EPA, opined that because Plaintiff's investigation discovered that *certain* data had been falsified, the Technical Team could not say that *any* of the data were reliable *even if* the statistical tests did not show any issues with the data.

---

[5] Five Point Holdings, LLC (Five Point) has since filed a lawsuit against TtEC falsely alleging that Five Point first became aware in 2018 of data quality questions surrounding TtEC's work at Hunters Point. TtEC denies the allegations in Five Point's lawsuit.

16699886.1

In response, CH2M representatives Scott Hay and Robert (Bob) Kirkbright reassured Ms. Lee that the statistical tests engineered by CH2M would turn up anomalies in the data, and stated that CH2M would utilize tests designed to show instances where Plaintiff's data may have been falsified.

53.     A representative from the City of San Francisco who was present at the meeting expressed concern about the Navy's selection of CH2M for the data evaluation given distrust of CH2M in the community because of its history with monitoring issues at Hunters Point.

54.     Thereafter, CH2M, with the assistance and/or input of other members of the Evaluation Team, prepared at least the following reports purporting to "evaluate" the data Plaintiff collected at Hunters Point:

- Draft Radiological Data Evaluation Findings Report for Parcels B and G Soil, Former Hunters Point Naval Shipyard San Francisco, California (Draft Parcels B and G Report) dated September 2017;

- Draft Radiological Data Evaluation Findings Report for Parcels D-2, UC-1, UC-2, and UC-3 Soil, Former Hunters Point Naval Shipyard San Francisco, California (Draft Parcels D-2 and UC's Report) dated September 2017;

- Draft Radiological Data Evaluation Findings Report for Parcel C Soil, Former Hunters Point Naval Shipyard San Francisco, California  (Draft Parcel C Report) dated November 2017;

- Draft Radiological Data Evaluation Findings Report for Parcel E Soil, Former Hunters Point Naval Shipyard San Francisco, California (Draft Parcel E Report) dated December 2017;

- Draft Building Radiation Survey Data Initial Evaluation Report, Former Hunters Point Naval Shipyard San Francisco, California (Draft Building Survey Report) dated March 2018;

(together, the Draft Reports).

**G.     DEFENDANTS' NEGLIGENT PREPARATION OF THE DRAFT REPORTS**

55.     The Draft Reports were prepared negligently. They are inconsistent with the Navy's contract objectives because they fail to assess whether past radiological remedial actions conducted at Hunters Point ensured no unacceptable human health impacts. The Draft Reports fail this basic objective because they do not adequately or appropriately evaluate the integrity or

16699886.1

1  reliability of Plaintiff's collected data. In addition, the Draft Reports are not remotely "clear,"

2  "concise," or "complete."

3      56.    The Evaluation Team did not use methods based on science or statistics. As a

4  result, the Draft Reports invent data unreliability, and then mischaracterize both the existence and

5  degree of data unreliability at the Site. Examples of the Evaluation Team's negligence include

6  making biased and incorrect assumptions, using arbitrary "logic" tests, misapplying statistical

7  analyses, applying subjective decision rules inconsistently, and omitting key data from data graphs

8  and plots. The Evaluation Team did not take steps to ensure consistency across its team members'

9  analyses and appears to have employed unqualified personnel who did not meet the job

10  qualification standards specified by the Navy. Examples of each of these problems are detailed

11  below.

12      57.    The Evaluation Team used arbitrary "logic" tests to generate false and biased

13  conclusions. These "logic" tests would flag sampling data collected at any environmental

14  remediation site as unreliable. For instance, one of these "logic" tests asked whether all final

15  systematic samples had been collected on the same day, which is a meaningless criterion because

16  there was no rationale or requirement to collect all final systematic samples on the same day.

17      58.    The Evaluation Team's data evaluations are hopelessly infected with subjective

18  bias. The Evaluation Team made subjective determinations based on review of data graphs, but the

19  graphs themselves are often inaccurate and blatantly misrepresent the data. The Evaluation Team

20  piled bad analytical technique on top of poor data representations to conclude that Plaintiff's data

21  are "potentially" unreliable.

22      59.    In other instances, the Evaluation Team used statistical assessments and

23  comparisons while relying on as few as two samples. It then compared these test populations

24  consisting of 2-3 samples to populations of several hundred samples. Statistical comparison is

25  unreliable when comparing such diverse data populations. This error is particularly difficult to

26  discern from the Draft Reports because the Evaluation Team omitted the critical variable—sample

27  size—from its box graphs. This omission makes it difficult to discover the improper comparison

28  of disparate sample sizes and to tell when the statistical method itself has been improperly

-14-
COMPLAINT

deployed. The box plot method the Evaluation Team used on sample sizes of 2-3 samples is not appropriate for a sample size of fewer than 5. By omitting the sample size from its box plots, the Evaluation Team presented incomplete and misleading data.

60.     During Oak Ridge Associated Universities' (ORAU) review of the Draft Reports, Oak Ridge told CH2M that the box plots were not appropriately deployed to compare data from small samples sizes with data from sample sizes more than an order of magnitude greater. These criticisms were ignored, and the inappropriate box graph analysis remained in the Draft Reports.

61.     The Evaluation Team also applied decision rules inconsistently to label certain data unreliable. For instance, in some cases the Evaluation Team determined that the collection of final systematic samples on different days was evidence of potential falsification, when in other instances the collection of final systematic samples on different days was not evidence of potential falsification. The Evaluation Team also sometimes found that radionuclide concentrations at or near zero were evidence of potential falsification, and in other instances similar concentrations were not evidence of potential falsification. Not only does the inconsistent application of its decision tree render the Evaluation Team's work irreproducible and unreliable, it smacks of results-driven analysis, which calls all of the Evaluation Team's work into question.

62.     The Evaluation Team relied on incorrect underlying assumptions in conducting its analysis. For instance, the Evaluation Team incorrectly assumed that higher gamma scan results indicated the presence of higher levels of radionuclides of concern, contradicting known science and CDPH's own Site observations that gamma scan results predominantly indicate the presence of naturally occurring Potassium-40, not elevated concentrations of radionuclides of concern.

63.     Some of the Evaluation Team's assumptions are inexplicable. For example, it incorrectly assumed uniform soil conditions across the Site, despite ample evidence that Hunters Point includes highly variable soil conditions as a result of the substantial use of imported fill derived from myriad sources. The Evaluation Team's easily disproved and faulty assumption again demonstrates the likelihood that CH2M purposely found potential data unreliability at the Site, so that CH2M would then be awarded a contract to conduct further "remediation."

64.     The Evaluation Team failed to consider and/or ignored other explanations for data

16699886.1

variability, including soil heterogeneity, distributional misspecification, outliers, or spatial variability. Instead, the Evaluation Team labeled any instance of data variability as evidence of potential data manipulation or falsification.

65. The Evaluation Team also failed to consider alternative explanations, including human error or innocent data corruption, and in many instances ignored multiple lines of evidence, in violation of its Navy contracts, to determine whether there was any actual evidence of falsification or manipulation.

66. The Evaluation Team's errors, faulty assumptions, and unproven methodologies caused predominantly false positive indications of potential data unreliability. Consideration of multiple lines of evidence, other trends and explanations, and application of scientific, rather than arbitrary, criteria would have demonstrated that Plaintiff's data are accurate and reliable.

67. The Evaluation Team further neglected to examine the contract requirements and remediation processes established by the Navy for Plaintiff's work. The Evaluation Team did not consider whether data had been collected in compliance with the Navy's specifications. As a result, the Evaluation Team did not take those specifications into account when reviewing the data and drawing conclusions about the data's reliability.

68. In fact, many of the tests the Evaluation Team applied to Plaintiff's data conflict with the contracts, task orders, work plans, and Navy guidance and specifications that governed Plaintiff's work at the Site. Compounding this inexcusable approach of ignoring the rules under which Plaintiff operated during its remediation of the Site, the Evaluation Team applied *its own tests* arbitrarily and inconsistently, depending on which member of the Team was reviewing a particular data set at a given time. This lack of quality control for the Evaluation Team's work renders all of its work suspect.

69. In addition, the Draft Reports do not include specific information about the requirements for demonstrating compliance with radiological release criteria. Given that the radiological release criteria specified by the Navy governed Plaintiff's remediation work at the Site and determined "whether radiological remedial actions conducted at [Hunters Point] have been adequately completed[,]" this oversight is inexcusable. The Draft Reports gloss over what

16699886.1

1   Plaintiff was tasked to do, thereby ignoring the stated primary objective of the Navy's contract

2   with CH2M.

3        70.    Moreover, despite Navy contract requirements outlining the specific skill set

4   necessary for completing the evaluation required under the contract, the primary personnel

5   undertaking Defendants' data evaluation did not have the requisite skills and experience to comply

6   with that contractual requirement or to adequately assess the remediation work completed at the

7   Site.

8        71.    As a result, the so-called evaluation is not in compliance with the primary objective

9   of Contract Task Order FZ 12 "to assess whether radiological remedial actions conducted at

10   HPNS [were] adequately completed to ensure there are no unacceptable human health impacts

11   from radioisotopes of concern at [Hunters Point] CERCLA sites."

12        72.    This improper, biased, and unscientific review of the data led the Evaluation Team

13   to the incorrect and unsupportable conclusion that a significant amount of Plaintiff's data

14   demonstrate "potential" data manipulation or falsification, which in turn led the Navy and

15   regulatory agencies to conclude that Plaintiff's data are unreliable.

16   **H.     CH2M'S CONFLICT OF INTEREST**

17        73.    CH2M is a direct competitor of Plaintiff. CH2M and Plaintiff compete for similar

18   work from the Navy—during the period of 2008 to 2020 each were awarded approximately $415

19   million in Navy contracts.

20        74.    As a direct competitor, CH2M has reason to undermine Plaintiff's work and the

21   reliability of its data in order to gain an unfair competitive advantage over Plaintiff.

22        75.    Moreover, CH2M was motivated to find reliability issues with as much of

23   Plaintiff's data as possible, because in addition to CH2M's contract for evaluation of Plaintiff's

24   data—Contract N62470-16-D-9000—CH2M was awarded a contract to conduct the confirmation

25   fieldwork based upon CH2M's assessment of Plaintiff's data—Contract N62473-09-D-2622. The

26   more allegedly unreliable data that CH2M found, the more confirmation fieldwork, rework, and

27   profit CH2M would secure in the future—sound science and Navy contractual requirements

28   notwithstanding.

76.      CH2M's Final Parcel G Removal Site Evaluation Work Plan, Former Hunters Point Naval Shipyard, San Francisco, CA, June 2019 (Parcel G Work Plan)[6] betrays CH2M's motive. The Parcel G Work Plan is designed to trigger a complete re-do of Plaintiff's work at Parcel G for the benefit of CH2M and its subcontractors, not the environment or the community. CH2M will be paid to complete the unnecessary re-excavation, re-sampling, and re-analysis of Plaintiff's work at that location, despite the fact that Plaintiff's data reliably demonstrate that there is no risk to human health or the environment at Parcel G or anywhere else Plaintiff worked at the Site.

77.      CH2M will conduct confirmation fieldwork across the Site, with estimated payments for the work exceeding $200 million dollars over the course of at least four to five years.

78.      While Navy contracting officers are required to mitigate potential organizational conflicts of interest (OCIs), they failed to do so here. *See* Federal Acquisition Regulation 48 C.F.R. § 9.504(a). Despite these contracting requirements, and the fact that the Navy called for an "independent third-party evaluation" of Plaintiff's prior data, the Navy did not conduct an evaluation of CH2M's potential OCIs prior to awarding Contract No. N62470-16-D-9000, Task Order FZ 12, or Contract No. N62473-09-D-2622, Task Orders 0003 and 0005.

79.      CH2M also failed to alert the Navy to its potential OCIs, in violation of contractual and regulatory requirements. Contract No. N62470-16-D-9000 and Task Order FZ 12, as well as applicable regulations, required CH2M to evaluate organizational, personnel, and personal potential conflicts of interest and to make disclosures to the Navy if a potential conflict was identified. CH2M violated these requirements by failing to evaluate and notify the Navy of potential conflicts of interest, including its impaired objectivity, inability to render impartial advice, and its other competing interests. *See* 48 C.F.R. §§ 3.1100, 9.500.

80.      As a result, the Navy received reports that failed to meet even minimal scientific and statistical standards, while also failing to satisfy the objectives of the applicable Navy

---

[6] The Parcel G Work Plan is available for download here:
https://www.bracpmo.navy.mil/brac_bases/california/former_shipyard_hunters_point/documents1.html#ParcelG

16699886.1

1  contracts.

2  **I.     PLAINTIFF'S DISCOVERY OF THE DRAFT REPORTS AND DEFENDANTS'**
3  **NEGLIGENCE**

4      81.    Plaintiff was alerted to the possible existence of the Draft Reports in or about early

5  2018. The Draft Reports were publicly disseminated by Greenaction for Environmental Justice

6  and others.

7      82.    After learning of the existence of the reports, Plaintiff repeatedly requested true and

8  correct copies of the Draft Reports from the Navy. It was May 2018 before the Navy finally

9  provided Plaintiff with copies of the Draft Reports.

10     83.    Plaintiff did not discover the full extent of the Defendants' malfeasance in

11 preparing the Draft Reports until much later. Because the Draft Reports are technical, and because

12 they are unclear, CH2M's murky methodology was difficult to unearth. Plaintiff required the

13 assistance of expert analysis to evaluate the Draft Reports in order to arrive at the now inescapable

14 conclusion that the Draft Reports are founded on incorrect assumptions and illegitimate

15 methodologies for assessing Plaintiff's data. Plaintiff's experts began analyzing the Draft Reports

16 in or about the summer of 2018; those analyses continue to date. The Draft Reports are such a

17 mess of shoddy work, and sloppy, unscientific, and puerile analyses, with unintelligible and

18 obfuscatory write-ups, that Plaintiff's experts continue to discover additional inaccuracies,

19 inconsistencies, and improper data assessment.

20     84.    Notably, it does not appear that the Draft Reports were finalized, and the Navy has

21 never released the Draft Reports officially to the public. Yet, the Draft Reports are widely

22 circulated online to the detriment of Plaintiff's reputation.

23                    **VI.     PLAINTIFFS' DAMAGES**

24     85.    Plaintiff has been injured by the dissemination of the negligently prepared Draft

25 Reports.

26     86.    Plaintiff has suffered damage to its reputation as a result of the false conclusions

27 printed in the Draft Reports.

28     87.    As indicated above, the Draft Reports have been published extensively online, and

16699886.1

formed the basis for numerous scandalous and defamatory media articles concerning Plaintiff's work at Hunters Point and elsewhere.

88.     The damage to Plaintiff's reputation has resulted in lost contracts and business opportunities.

89.     Plaintiff has suffered the loss of federal, state, and local government contracts and commercial contracts as a result of the false conclusions printed in the Draft Reports concerning the reliability of Plaintiff's data.

90.     Plaintiff has suffered harm to its business relationship with the Navy as a result of the false conclusions printed in the Draft Reports. The Navy has relied on the false conclusions of the Draft Reports in issuing negative statements and evaluations concerning Plaintiff's work at the Site.

91.     Other federal agencies have relied upon and inflated the misrepresentations made by Defendants. EPA compounded Defendants' subjective and arbitrary approach to the data evaluation by blindly accepting Defendants' false conclusions that approximately half of Plaintiff's data were "suspect." Applying its own outcome-oriented methodology, EPA then conducted an analysis of all remaining Survey Unit data from the areas Defendants had cleared. This "tails-I-win-heads-you-lose" approach allowed EPA to conclude that the majority of Plaintiff's collected remediation data were "suspect" and required further confirmatory testing. Defendants gladly agreed to resample all areas where Plaintiff worked, wasting untold millions in public funds and further damaging Plaintiff's reputation.

92.     The Draft Reports' false conclusions have even influenced U.S. House of Representatives Speaker Nancy Pelosi, who has gone so far as to publicly discourage the federal government from contracting with "Tetra Tech," and U.S. Senate Minority Leader, Charles Schumer, who called for independent testing of "Tetra Tech's" sampling at other Navy cleanup sites, despite no allegations calling into question Plaintiff's work at such sites.

93.     As a result of the false conclusions contained in the Evaluation Team's Draft Reports, Plaintiff has been named in a number of lawsuits, which generally allege that Plaintiff failed to properly investigate, test, and remediate the Site. Many of these lawsuits rely, at least in

part, on the false conclusions contained in the Draft Reports, which cast unfair doubt on a substantial portion of the data collected by Plaintiff during the course of its remediation work at the Site.

**FIRST CAUSE OF ACTION**

**(Negligence – Against All Defendants)**

94.     Plaintiffs re-allege and incorporate by reference the preceding paragraphs above as though set forth fully herein.

95.     The Evaluation Team owed a duty to Plaintiff to exercise reasonable and ordinary care when evaluating Plaintiff's data to avoid causing unwarranted economic, reputational, or other injury to Plaintiff. That duty arises from the nature of the radiological data evaluation the Evaluation Team was tasked with performing under their contract(s) with the Navy, which required the Evaluation Team to provide an accurate evaluation of the integrity of Plaintiff's data, which the Evaluation Team failed to provide. The negligent evaluation that Defendants conducted harmed Plaintiff.

96.     The Evaluation Team breached its duty to Plaintiff by failing to provide an unbiased, accurate, and scientifically-based assessment of Plaintiff's data and by misrepresenting the work that Plaintiff completed at the Site. The Evaluation Team's negligence has negatively impacted Plaintiff and caused it substantial harm, including but not limited to harm to its reputation and lost business. Plaintiff's harm is a direct and proximate result of the Evaluation Team's negligence.

97.     Defendants held themselves out as having the unique scientific and statistical evaluation knowledge necessary to adequately assess Plaintiff's data, when in fact, Defendants were unable to provide an unbiased, scientifically sound, and statistically rigorous evaluation of Plaintiff's data.

98.     The Evaluation Team knew, or should have known, that failure to accurately assess Plaintiff's prior data could result in harm to Plaintiff, its reputation, and its business relationships. Accordingly, it was foreseeable that the Evaluation Team's negligence could harm Plaintiff.

99.     The Evaluation Team's approach to its task, its analysis of Plaintiff's data, and its

16699886.1

write-up of its findings in the Draft Reports was intended to harm Plaintiff by calling Plaintiff's data into question, while simultaneously rewarding Defendants with remunerative work ostensibly to "fix" the remediation work that the Evaluation Team erroneously identified as incomplete.

100.   Defendants likewise, through their unfounded attacks on Plaintiff's credibility, skills, and professionalism, as set forth in the Draft Reports, intended to engineer future remediation work for themselves, at Plaintiff's expense.

108.   As a result of Defendants' negligence, Plaintiff suffered harm, including harm to its reputation and business relationships. Defendants' negligence in preparing the Draft Reports was a substantial factor in the harm Plaintiff has suffered, the full extent of which will be determined at trial.

## SECOND CAUSE OF ACTION

### (Negligent Misrepresentation – Against All Defendants)

101.   Plaintiffs re-allege and incorporate by reference the preceding paragraphs above as though set forth fully herein.

102.   Defendants, in assessing Plaintiff's radiological data, negligently misrepresented crucial facts and information, which they knew or should have known to be false, about the extent of the unreliability of Plaintiff's data. Those misrepresentations created the false impression that a significant portion of Plaintiff's Site data are unreliable.

103.   Defendants' many deceits in the Draft Reports were targeted at harming Plaintiff and depriving Plaintiff of its good name and opportunities to secure further environmental remediation work for which Defendants are in competition with Plaintiff.

104.   Defendants knew or should have known that the Navy and others would rely upon the false conclusions contained in the Draft Reports, and Defendants intended for the Navy and others to rely upon those false conclusions. Accordingly, it was foreseeable that Defendants' misrepresentations could cause Plaintiff harm.

105.   The Navy and other regulatory agencies have relied upon Defendants' assessment in determining that a significant portion of Plaintiff's remediation work at the Site was unreliable and requiring confirmatory testing of all of Plaintiff's work. The Navy's reliance upon

Defendants' assessment and oversight is evident in the Navy's public communications, including the Parcel G Work Plan. Other federal agencies, including EPA and DTSC, as well as the public at large, have relied upon the misrepresentations made by Defendants in requiring or requesting that confirmatory investigations be conducted concerning Plaintiff's work at the Site. Defendants' misrepresentations have also been relied on by complainants who have filed lawsuits against Plaintiff alleging that Plaintiff failed to properly investigate, test, and remediate and/or engaged in widespread data manipulation and/or falsification during the course of Plaintiff's work at the Site.

106.    As a direct and proximate result of Defendants' misrepresentations, Plaintiff has suffered harm. The government's and the public's reliance upon the false conclusions in Defendants' Draft Reports was a substantial factor in causing the harm Plaintiff has suffered and will continue to suffer, the full extent of which will be determined at trial.

**THIRD CAUSE OF ACTION**

**(Equitable Indemnification – Against All Defendants)**

107.    Plaintiffs re-allege and incorporate by reference the preceding paragraphs above as though set forth fully herein.

108.    Due to Defendants' negligence, misrepresentations, and misconduct, Plaintiff has become a party to multiple lawsuits. These lawsuits generally allege that Plaintiff failed to properly investigate, test, and remediate the Site and engaged in widespread data manipulation and/or falsification during the course of Plaintiff's work at the Site. Many of these lawsuits rely, at least in part, on the false conclusions contained in the Draft Reports, which cast doubt on a substantial portion of the data collected by Plaintiff during the course of its remediation work at the Site. Defendants' negligence, misrepresentations, and misconduct were a substantial factor in causing Plaintiff to be sued. Numerous cases have been filed, and it is possible that additional cases may be filed in the future.

109.    Plaintiff denies that it failed to properly investigate, test, and remediate the Site. When the wrongful conduct of a small group of employees and subcontractors was discovered, Plaintiff took immediate action to correct that wrongdoing and appropriately investigate and remediate the areas involved. Plaintiff rejected all suspect data it discovered during the course of

16699886.1

its investigation. Plaintiff denies liability for the alleged "potential" data manipulation and/or falsification claimed by Defendants in the Draft Reports.

110.    Plaintiff is entitled to equitable indemnification and/or contribution from Defendants for its costs incurred in defending against claims of significant data unreliability arising from Defendants' misrepresentations concerning the reliability of Plaintiff's remediation data.

111.    If liability against Plaintiff should be established in any action as a result of Defendants' wrongful conduct, where liability is expressly denied by Plaintiff, Defendants are obligated to indemnify and hold harmless Plaintiff from and against any and all claims, losses, damages, attorneys' fees, judgments and settlement expenses incurred as a result of Defendants' failure to truthfully and adequately assess the validity of Plaintiff's remediation data and the fulfillment of its remediation obligations.

112.    As a result of Defendants' improper conduct, Plaintiff has incurred and continues to incur attorneys' fees and costs in responding to claims predicated upon Defendants' misrepresentations concerning Plaintiff, in an amount to be determined at trial.

## VII.    PRAYER FOR RELIEF

Plaintiff prays for relief as follows:

A.    For compensatory and special damages according to proof at trial;

B.    For exemplary damages according to proof;

C.    For equitable indemnification;

D.    For costs of suit;

E.    For interest at the maximum legal rate;

F.    For any and all other relief the Court deems just and proper.

COMPLAINT

16699886.1

1

## VIII.   JURY DEMAND

2

Plaintiff hereby demands a jury trial.

3

DATED:  July 14, 2020                          HANSON BRIDGETT LLP

4

5

By:      /s/ *Davina Pujari*

6

DAVINA PUJARI

7

CHRISTOPHER A. RHEINHEIMER
SAMIR J. ABDELNOUR

8

MELISSA M. MALSTROM
Attorneys for Tetra Tech EC, Inc.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

16699886.1