1  HANSON BRIDGETT LLP
   DAVINA PUJARI, SBN 183407
2  dpujari@hansonbridgett.com
   CHRISTOPHER A. RHEINHEIMER, SBN 253890
3  crheinheimer@hansonbridgett.com
   SAMIR J. ABDELNOUR, SBN 271636
4  sabdelnour@hansonbridgett.com
   MELISSA M. MALSTROM, SBN 314012
5  mmalstrom@hansonbridgett.com
   425 Market Street, 26th Floor
6  San Francisco, California 94105
   Telephone:     (415) 777-3200
7  Facsimile:     (415) 541-9366

8  Attorneys for Plaintiff
   TETRA TECH EC, INC.

9

## UNITED STATES DISTRICT COURT

10

## NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

11

12

| | |
|---|---|
| TETRA TECH EC, INC., | Case No. 3:20-cv-04704-JD |
| Plaintiff, | **FIRST AMENDED COMPLAINT FOR:** |
| v. | **(1) INDUCING BREACH OF CONTRACT** |
| CH2M HILL, INC., BATTELLE MEMORIAL INSTITUTE, CABRERA SERVICES, INC., PERMAFIX ENVIRONMENTAL SERVICES, INC., and SC&A, INC., | **(2) INTENTIONAL INTERFERENCE WITH CONTRACTUAL RELATIONS** |
| | **(3) NEGLIGENCE** |
| Defendants. | **(4) EQUITABLE INDEMNIFICATION/CONTRIBUTION** |
| | **(5) UNFAIR BUSINESS PRACTICES (Cal. Bus. & Prof. Code §§ 17200 *et seq*.)** |
| | **DEMAND FOR JURY TRIAL** |

## I.     INTRODUCTION

1.     In 2016, the United States Navy hired Defendants to evaluate environmental data collected by Tetra Tech EC, Inc. (TtEC or Plaintiff) at Hunters Point Naval Shipyard (Hunters Point or the Site) and to perform confirmation surveys. Defendants, direct competitors of Plaintiff, developed biased, arbitrary, and unscientific tests and methods not based on applicable contracts or environmental standards to evaluate Plaintiff's data. Defendants applied these flawed tests and methods to undermine the reliability of Plaintiff's data based on findings that "potential" data manipulation or falsification occurred during Plaintiff's work at the Site. Defendants' findings have no basis in science, statistics, contract, or environmental law.

2.     Defendants knew they stood to gain significant economic benefits should Plaintiff's data be labeled suspect or unreliable, because Defendants would be hired to conduct confirmation surveys. Defendants intended to undermine Plaintiff's work to secure more work from the Navy for themselves—the more potential data manipulation or falsification they found, the more work they stood to gain. Defendants will reap over $14 million for their flawed evaluation. Defendants also created the opportunity to perform rework at the Site costing millions of dollars—rework that Defendants misled the Navy to believe is necessary because of Defendants' baseless findings.

3.     Defendants' evaluation of Plaintiff's data was so biased and arbitrary that data from *any* environmentally impacted site in the United States would yield a similar determination that such data are unreliable due to "potential" data manipulation or falsification.

4.     In truth, TtEC's environmental data were collected, analyzed, and applied in accordance with governing contracts and environmental specifications under strict regulatory oversight.

5.     Defendants intended to induce the Navy to breach its existing contracts with TtEC, to dissuade the Navy from contracting with TtEC, and to obtain additional work at the Site for themselves.

6.     Defendants described their data evaluation and findings in draft reports which contain evidence of Defendants' wrongful conduct. *See Park v. Bd. of Trustees of Cal. State Univ.,* 2 Cal.5th 1057, 1060, 1065 (2017).

## II.   JURISDICTION

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 because the conduct giving rise to this action occurred on a federal enclave at Hunters Point.

## III.   VENUE

8.      Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, because the property that is the subject of this action is situated in this District, and a substantial portion of the events giving rise to this claim occurred in the District.

## IV.   PARTIES

9.      Plaintiff TtEC is an environmental construction company incorporated in Delaware, with its principal place of business in San Diego, California. Plaintiff is a subsidiary of Tetra Tech, Inc. Plaintiff conducted remediation and construction work at Hunters Point.

10.     Defendant CH2M Hill, Inc. (CH2M) is an engineering and consulting company incorporated in Florida, with its principal place of business in Englewood, Colorado. CH2M contracted with the United States Navy (Navy) to evaluate radiological remediation data collected by Plaintiff at Hunters Point, to conduct confirmation surveys, and to repeat Plaintiff's remediation work where the Navy determined it necessary based on Defendants' findings.

11.     Defendant Battelle Memorial Institute (Battelle) is a global research and development organization headquartered in Columbus, Ohio. Battelle contracted with the Navy and/or subcontracted with CH2M to evaluate radiological remediation data collected by Plaintiff at Hunters Point, to conduct confirmation surveys, and to repeat Plaintiff's remediation work where the Navy determined it necessary based on Defendants' findings.

12.     Defendant Cabrera Services Inc. (Cabrera) is a provider of environmental and radiological services. Cabrera is incorporated in Connecticut and its principal place of business is located in East Hartford, Connecticut. Cabrera contracted with the Navy and/or subcontracted with CH2M to evaluate radiological remediation data collected by Plaintiff at Hunters Point, to conduct confirmation surveys, and to repeat Plaintiff's remediation work where the Navy determined it necessary based on Defendants' findings.

13.     Defendant PermaFix Environmental Services, Inc. (PermaFix) is a nuclear services

and waste management company incorporated in Delaware. Its principal place of business is in Atlanta, Georgia. PermaFix contracted with the Navy and/or subcontracted with CH2M to evaluate radiological remediation data collected by Plaintiff at Hunters Point, to conduct confirmation surveys, and to repeat Plaintiff's remediation work where the Navy determined it necessary based on Defendants' findings.

14.     Defendant SC&A Inc. (SC&A) is an environmental and energy consulting company incorporated in Virginia, with its principal place of business in Arlington, Virginia. SC&A contracted with the Navy and subcontracted with CH2M to evaluate radiological remediation data collected by Plaintiff at Hunters Point, to conduct confirmation surveys, and/or to repeat Plaintiff's remediation work where the Navy determined it necessary based on Defendants' findings.[1]

## V.     FACTS

### A.     HUNTERS POINT NAVAL SHIPYARD

15.     Hunters Point borders San Francisco Bay in the southeast portion of the City of San Francisco. It comprises over 900 acres, approximately half of which are under water. Some of its existing dry lands were reclaimed from San Francisco Bay beginning in the late 1800s, and consist largely of fill materials taken from land and hills in the area, and other locations in and around San Francisco Bay. The fill material also includes dredge spoils and demolition debris.

16.     The Navy acquired Hunters Point through a series of purchases and condemnations beginning in or about 1940, and the United States accepted federal jurisdiction over Hunters Point pursuant to the U.S. Constitution and California law.

17.     The Navy operated a naval base at Hunters Point from approximately 1940 until the base was deactivated in or about 1974. Private companies operated on the Site before, during, and after its use as a naval base. In 1986, the Navy briefly resumed operation of a shipyard at Hunters Point, as an annex to the Naval Station Treasure Island. Shipyard operations permanently ceased at

---

[1] Allegations concerning Battelle, Cabrera, PermaFix, and SC&A are made on information and belief. The precise role of each of these Defendants is not known to Plaintiff but is known by Defendants.

1    the Site in 1989. In 1991, the Navy placed Hunters Point on the Navy's Base Realignment and

2    Closure (BRAC) list, and slated it for closure.

3          18.    During the Site's use as a naval base, the Navy used radioactive materials on base

4    to support naval operations, including the World War II war effort, and in research at the Navy's

5    Radiation Laboratory and Naval Radiological Defense Laboratory. The Navy used radioactive

6    materials to refurbish radioluminescent devices, in gamma radiography, and to calibrate radiation

7    detection instruments. The Navy also decontaminated radiologically-impacted vessels at Hunters

8    Point and researched radiological decontamination and human and animal health effects caused by

9    radiation exposure.

10         19.    In 2004, the Naval Sea Systems Command published the Hunters Point Shipyard

11   Final Historical Radiological Assessment, History of the Use of General Radioactive Materials

12   1939–2003, which documents the history and use of radioactive materials at the Site.[2]

13         20.    In addition to its radiological contamination of the Site, the Navy also contaminated

14   soil, dust, sediments, surface water, and groundwater with petroleum fuels, pesticides, heavy

15   metals, polychlorinated biphenyls (PCBs), and volatile organic compounds (VOCs). Soils at the

16   Site also contain naturally occurring radionuclides, asbestos, and metals.

17         21.    As a result of the contamination caused by the Navy's operations, the Site was

18   added to the Comprehensive Environmental Response Compensation and Liability Act

19   (CERCLA), also known as Superfund, National Priorities List on November 21, 1989.

20         22.    Thereafter, Hunters Point was slated for cleanup and included in the Department of

21   Defense's Installation Restoration Program, whereby the Department identifies, investigates, and

22   cleans up contamination at military sites throughout the country. The Site was divided into

23   alphanumeric parcels to facilitate cleanup.

24         23.    Because the Site is federally owned, the cleanup is governed by 42 U.S.C. § 9620.

25   The Navy is the lead agency responsible for investigation and cleanup of the Site. The

26

27   _____

     [2] The full report is available for download here:

28   https://www.bracpmo.navy.mil/content/dam/bracpmo/california/former_naval_shipyard_hunters_
     point/pdfs/all_documents/environmental_documents/radiological/hps_200408_hra.pdf

Environmental Protection Agency (EPA) and the State of California, through the California Department of Toxic Substance Control (DTSC) and San Francisco Regional Water Quality Control Board, oversee and enforce the Navy's cleanup actions. A Federal Facility Agreement, effective January 22, 1992,[3] governs coordination and regulatory oversight of the cleanup among the Navy, EPA, and the State of California.

24.     The Navy's BRAC Program Management Office (BRAC PMO) (a division of the Naval Facilities Engineering Command) manages the cleanup at Hunters Point with assistance from the Navy's Radiological Affairs Support Office (RASO).

**B.     TETRA TECH EC, INC.'S REMEDIATION ROLE AT HUNTERS POINT**

25.     Over the years, more than sixty different contractors performed investigation, remediation, and construction at Hunters Point. The Navy awarded Plaintiff numerous contract task orders and modifications for work at the Site.

26.     In February 2010, the Navy awarded Plaintiff Prime Contract N62473-10-D-0809 for radiological remediation work at Navy sites throughout the Western and Southwestern United States. In June 2010, Plaintiff was awarded Contract N62473-10-D-0809, Task Order 0002 for radiological remediation support at Hunters Point Parcel C. In September 2010, Plaintiff was awarded Contract N62473-10-D-0809, Task Order 0007 for radiological remediation and support at Hunters Point Parcel E. In July 2012, Plaintiff was awarded Contract N62473-10-D-0809, Task Order 0012 for radiological remediation and support at Hunters Point Parcel C.

27.     In April 2012, the Navy awarded Plaintiff Prime Contract N62473-12-D-2006 for environmental remediation services at various Navy installations throughout the Western and Southwestern United States. In September 2012, Plaintiff was awarded Contract N62473-12-D-2006, Task Order 0004 for Radiological Surveys of Buildings at Hunters Point Parcel C.

28.     Plaintiff's work at the Site was overseen by Navy RASO, BRAC PMO, and regulatory agencies including EPA, DTSC, and the California Department of Public Health (CDPH). Navy RASO visited the Site frequently, with representatives typically on-site one to two

---

[3] The Federal Facility Agreement for Hunters Point is available here:
https://www.navfac.navy.mil/niris/SOUTHWEST/HUNTERS_POINT_NS/N00217_005218.PDF

1  weeks per month inspecting and directing the radiological remediation.

2  **C.      ANOMALOUS SAMPLING, INVESTIGATION, AND CORRECTIVE ACTIONS**

3         29.     In 2012, during a routine telephone conference with Plaintiff, a Navy RASO

4  official raised questions about certain results in Plaintiff's soil sampling data. Final systematic

5  samples at one location (Building 517) appeared to report lower than expected Potassium-40

6  levels. Potassium-40 is not a contaminant of concern at the Site, but rather is a naturally occurring

7  radioisotope present throughout Hunters Point. Plaintiff conducted an extensive investigation in

8  close consultation with the Navy to determine the cause of the anomalous sampling results.

9         30.     Plaintiff summarized the investigation in a report entitled "Investigation

10 Conclusion Anomalous Soil Samples at Hunters Point Naval Shipyard." The first draft of the

11 report was submitted to the Navy on November 29, 2012, and to the Nuclear Regulatory

12 Commission (NRC) on December 3, 2012. The report was finalized in April 2014, after extensive

13 discussions with the Navy, and after Plaintiff had responded to and addressed multiple rounds of

14 comments from the Navy on the report.

15        31.     Although no one admitted to any improper sampling during Plaintiff's questioning

16 of employees and subcontractors, Plaintiff determined that the likely cause of the anomalous soil

17 sample results was that certain individuals had not collected soil samples from the locations

18 identified on chain-of-custody records. Plaintiff discussed this likely cause in its investigation

19 report.

20        32.     During and following the investigation, Plaintiff implemented multiple corrective

21 actions, in consultation with the Navy, to address the identified issues and to ensure sampling

22 accuracy. Plaintiff developed procedures to immediately identify and escalate any atypical sample

23 results. Plaintiff instituted additional training on sampling protocols and ethics, and increased

24 quality control surveillance. Plaintiff disciplined individuals associated with the irregular samples.

25 Plaintiff carefully reviewed all samples that showed inconsistencies with prior results, in

26 consultation with the Navy. New samples were collected to replace the irregular, rejected samples.

27 One draft remediation report was revised, and subsequent remediation reports were written based

28 only on new or validated sample results. No investigation or remediation decisions were made

based on the irregular, rejected samples. All of this work was done in close consultation with the Navy, at Plaintiff's expense.

33.     Plaintiff's investigation did not end with submission of the 2014 report. Rather, with the Navy's input, Plaintiff continued to evaluate previously surveyed units and address all issues identified.

34.     In total, Plaintiff and the Navy, working in close coordination, investigated 30 survey units with potentially anomalous data and corrected all issues identified.

35.     The Navy accepted Plaintiff's corrective actions and presented Plaintiff's investigation report to the regulatory agencies in July 2014.

36.     Following Plaintiff's investigation, the Navy awarded Plaintiff four additional contract task orders and numerous contract modifications for remediation work at Hunters Point. The Navy continued to pay Plaintiff for its work, and there was no indication over the next several years that the Navy was dissatisfied with Plaintiff's work at the Site.

37.     In 2017, two former employees of Plaintiff pleaded guilty to destruction, alteration, or falsification of records in violation of 18 U.S.C. § 1519, for their roles in the irregular sampling in 2012. The investigation report had already identified and addressed all sampling areas that were the subject of the plea agreements, even though these two former employees denied any wrongdoing during the investigation. No other individuals or entities were criminally prosecuted in connection with the anomalous data.

38.     Plaintiff's work at the Site was completed properly. The data are reliable and demonstrate, pursuant to contractual and regulatory standards, that no unacceptable risks to human health or the environment due to the presence of radionuclides exist in the areas where Plaintiff conducted remediation.

**D.     NUCLEAR REGULATORY COMMISSION (NRC) INVESTIGATION**

39.     The NRC independently investigated the anomalous sampling after Plaintiff provided its investigation report to the NRC in 2012. The NRC's investigation lasted over a year and included interviews of several individuals associated with the anomalous sampling and their onsite managers. The NRC determined that two individuals, acting outside of Plaintiff's

established protocols, gathered samples from areas other than where the samples were identified as having originated.

40.     The NRC concluded that Plaintiff's management was not involved in the sample falsification engaged in by these two individuals.

41.     The NRC's investigation results were consistent with the investigation conducted by Plaintiff in consultation with the Navy.

42.     The NRC did not identify any other sampling issues associated with Plaintiff's work during its investigation.

**E.     FALSE CLAIMS ACT CASES**

43.     In 2013, former subcontractor employees filed a False Claims Act case under seal, alleging wrongdoing by Plaintiff and subcontractors working at Hunters Point. The False Claims Act case, if successful, will result in a substantial monetary award to the complainants. The allegations include a wide variety of purported wrongdoing. Some allegations derive from misunderstandings of technical and regulatory requirements, while others relate to alleged wrongful discharge and employment claims, many of which had been investigated already and found to lack merit.

44.     In 2016, additional complainants, represented by the same attorney, came forward with additional allegations relating to remediation and construction work allegedly performed by Plaintiff, Tetra Tech, Inc., and Shaw Environmental and Infrastructure, Inc. at Hunters Point, Treasure Island Naval Station, and Alameda Naval Station. The allegations cover a wide variety of time periods, purported misconduct, and in many instances stem from an alleged investigation undertaken by Anthony Smith, a former employee of subcontractor New World Environmental, Inc. (New World), and his attorney several years after Mr. Smith was removed from Hunters Point.

45.     Mr. Smith, a long-time employee of New World, was implicated in the 2012 anomalous sampling issues Plaintiff had investigated and corrected to the Navy's satisfaction, and has himself admitted to switching soil samples and falsifying sample records, but to date has not been prosecuted by the government. Around the time Mr. Smith began leveling accusations

1   against Plaintiff, the Navy engaged Defendants to conduct the data evaluation at issue here.

2   46.   In the fall of 2018, the Department of Justice intervened in some of the

3   complainants' False Claims Act actions with respect to some of the allegations made about

4   Hunters Point. The False Claims Act litigation is ongoing.

5   **F.   THE CONTRACT FOR DATA EVALUATION AND CONFIRMATION SURVEYS**

6   47.   In 2016, the Navy assembled a "Technical Team" (also known as the Hunters Point

7   Tiger Team) to evaluate radiological data collected by Plaintiff at Hunters Point. The Technical

8   Team includes representatives from the Navy, EPA, DTSC, CDPH, the City of San Francisco, and

9   Oregon State University.

10   48.   CH2M submitted a proposal to the Navy on or about November 9, 2016, and was

11   selected as the primary contractor to evaluate Plaintiff's data. The Navy awarded CH2M Contract

12   Task Order FZ12 (CTO FZ12) on or about November 15, 2016.

13   49.   CH2M subcontracted with Battelle, Cabrera, PermaFix, and SC&A to evaluate

14   Plaintiff's radiological data and/or perform confirmation surveys at Hunters Point.

15   50.   CTO FZ12 required Defendants "to demonstrate to the regulatory agencies

16   (particularly the EPA and DTSC) and public stakeholders that human health impacts from

17   radioisotopes of concern at [Hunters Point] CERCLA sites are within acceptable levels"; "to

18   evaluate the integrity of data collected during past radiological investigation and cleanup activities

19   at [Hunters Point] and determine if, where, and how follow-up data should be collected to validate

20   remedial decisions regarding the current property condition"; and "to develop the methods using

21   concepts put forth by personnel with specialization and experience in radiological projects."

22   51.   Under CTO FZ12, CH2M was required to "develop a complete understanding of

23   the site history, release criteria, decision logic, and specific survey processes employed at [Hunters

24   Point] during the radiological investigation and cleanup activities"; to review Final Status Survey

25   Reports, Final Survey Unit Reports, Final Survey Unit Project Report Abstracts, and Final

26   Removal Action Completion Reports prepared by TtEC pursuant to TtEC's contracts with the

27   Navy; and to review Final Basewide Work Plans, Final Execution Plans, Action Memorandum,

28   Sampling and Analysis Plans, and Task Survey Plans, all of which were deliverables required

1   under TtEC's contracts with the Navy. TtEC's contracts with the Navy are clearly identified on

2   many of these documents.

3        52.     Defendants knew about TtEC's contracts with the Navy, including Contracts

4   N62473-10-D-0809, N62473-12-D-2006, and their associated task orders. Defendants themselves

5   had been awarded similar contracts for work at the Site and other sites, and were familiar with the

6   Navy's contracting methods. In addition, by virtue of CTO FZ12 and Defendants' document

7   review and data evaluation, Defendants understood the nature and extent of the contractual

8   relationship between TtEC and the Navy for Hunters Point work, and the scope of the contracts

9   and task orders between TtEC and the Navy.

10        53.     CH2M's original CTO award totaled $100,000 but has since been modified five

11  times, ballooning to more than 143 times its original size, for a total award of $14,340,074.13.

12        54.     Defendants knew based on CTO FZ12 and discussions with the Technical Team

13  that if Plaintiff's data were found to be potentially manipulated or falsified, or in any way

14  unreliable, the Navy would contract with Defendants to conduct confirmation surveys and

15  additional work at the Site.

16        55.     On December 13, 2016, representatives of the Technical Team, along with

17  stakeholders in the future redevelopment project at Hunters Point, including a representative from

18  developer Five Point Holdings, LLC,[4] met to discuss the data evaluation and its objectives. The

19  Technical Team decided that all of Plaintiff's data from 2006 onward would be evaluated. CH2M

20  proposed to evaluate the data by running "statistical tests," but concerns were expressed that some

21  of data may not show any obvious anomalies. Lily Lee, an EPA representative, opined that

22  because Plaintiff's investigation discovered that *certain* data had been falsified, the Technical

23  Team could not say that *any* of TtEC's data were reliable *even if* the statistical tests failed to reveal

24  any issues with the data. In response, CH2M representative Robert (Bob) Kirkbright and Cabrera

25  Services representative Scott Hay assured Ms. Lee that the statistical tests engineered by CH2M

26

27  ────────────────
    [4] Five Point Holdings, LLC (Five Point) has filed a lawsuit against TtEC falsely alleging that Five
28  Point first became aware in 2018 of data quality questions surrounding TtEC's work at Hunters
    Point. TtEC denies the allegations in Five Point's lawsuit.

*would* identify anomalies in the data. Messrs. Kirkbright and Hay reassured Ms. Lee that they would run tests designed to find instances where Plaintiff's data may have been falsified.

56.     Defendants designed tests, including non-statistical tests, to find "potential" data manipulation or falsification in Plaintiff's radiological data where none existed. Defendants intentionally biased the data evaluation to induce the Navy into breaching its contracts with TtEC, to dissuade the Navy from contracting with TtEC, and to secure additional work for themselves at the Site.

57.     CH2M also sought to rehabilitate its image from previous environmental scandals, at Plaintiff's expense. In 2006, CH2M was hired by a developer to provide asbestos monitoring at Hunters Point and mishandled its monitoring responsibilities. Many months' worth of CH2M monitoring results could not be confirmed, resulting in the developer paying a half million dollar fine. CH2M's radiological remediation subsidiary was also named in a False Claims Act case for allegedly submitting false claims and paying kickbacks under a contract for cleanup of radioactive and hazardous waste at the Hanford Superfund Site in Washington State.

58.     A representative from the City of San Francisco who attended the December 2016 meeting expressed concern about the Navy's selection of CH2M for the data evaluation given distrust of CH2M in the community because of its air monitoring misconduct at Hunters Point.

59.     CH2M knew its evaluation of Plaintiff's data was an opportunity to rehabilitate its own reputation with the government and local community, and to sabotage its competitor, TtEC, which would create more work for Defendants.

60.     CH2M, with the assistance and/or input of the other Defendants, evaluated Plaintiff's radiological data, as evidenced in the following draft reports:

- Draft Radiological Data Evaluation Findings Report for Parcels B and G Soil, Former Hunters Point Naval Shipyard San Francisco, California (Draft Parcels B and G Report) dated September 2017;

- Draft Radiological Data Evaluation Findings Report for Parcels D-2, UC-1, UC-2, and UC-3 Soil, Former Hunters Point Naval Shipyard San Francisco, California (Draft Parcels D-2 and UC's Report) dated September 2017;

- Draft Radiological Data Evaluation Findings Report for Parcel C Soil, Former Hunters Point Naval Shipyard San Francisco, California  (Draft Parcel C Report) dated November 2017;

- Draft Radiological Data Evaluation Findings Report for Parcel E Soil, Former Hunters Point Naval Shipyard San Francisco, California (Draft Parcel E Report) dated December 2017;

- Draft Building Radiation Survey Data Initial Evaluation Report, Former Hunters Point Naval Shipyard San Francisco, California (Draft Building Survey Report) dated March 2018;

(together, the Draft Reports).

61.     The Navy stated it would evaluate CH2M's work under CTO FZ12 for "accuracy of data," "soundness of conclusions," "clarity and thoroughness," and "technical quality," among other factors. More than two years later, the Navy has not finalized the Draft Reports or officially released the Draft Reports to the public.

62.     The Draft Reports contain evidence of Defendants' misconduct, including their design of biased tests and evaluation methods, their misapplication of those tests and methods, and their incorrect findings that Plaintiff's radiological data are unreliable.

## G.     DEFENDANTS' FLAWED DATA EVALUATION

63.     Defendants designed tests to undermine the reliability of Plaintiff's data that are not based on science, statistics, or specifications and procedures applicable to radiological remediation at the Site. Defendants made and used incorrect assumptions, misapplied statistical methods, developed arbitrary tests, applied subjective decision rules inconsistently, and created flawed data graphs and plots, all to manufacture findings of "potential" data falsification and manipulation.

64.     Defendants relied on incorrect assumptions to conduct their data evaluation. For instance, Defendants wrongly assumed that high gamma scan results indicate high levels of radionuclides of concern, contradicting science and CDPH's findings that gamma scan results at the Site indicate naturally occurring Potassium-40, not radionuclides of concern. Defendants also wrongly assumed uniform soil conditions across the Site, despite knowing that Hunters Point has highly variable soil conditions because it contains imported fill from myriad sources.

65.     Defendants misapplied statistical tools to evaluate Plaintiff's data. At times, Defendants relied on as few as two samples for comparison to several hundred other samples. Statistical comparison is inherently unreliable when comparing such diverse data populations. Defendants concealed this error in statistical analysis by omitting the critical variable—sample

1    size—from their box plots.

2        66.    Oak Ridge Associated Universities reviewed Defendants' work and criticized

3    Defendants' box plots, which compared data from small samples sizes with data from sample sizes

4    more than an order of magnitude larger. Yet, Defendants ignored these valid criticisms because the

5    misleading box plots supported Defendants' baseless findings of potential data manipulation or

6    falsification.

7        67.    Defendants designed arbitrary tests to evaluate Plaintiff's data. For instance, one

8    test asked whether all final systematic samples in a survey unit were collected on the same day. No

9    scientific rationale or environmental requirement mandates that all final systematic samples be

10   collected on the same day. Defendants also incorrectly flagged radionuclide concentrations that

11   were at or near zero, even though such results are entirely expected at Hunters Point.

12       68.    Defendants inconsistently applied their tests. For instance, Defendants flagged the

13   collection of final systematic samples on different days as evidence of potential falsification at

14   some survey units, while at other survey units Defendants found that collection of final systematic

15   samples on different days was not evidence of potential falsification. Defendants sometimes found

16   that radionuclide concentrations at or near zero were evidence of potential falsification, but at

17   other times found these concentrations were not evidence of potential falsification.

18       69.    Defendants prepared data graphs that misrepresent the data. For instance, some of

19   Defendants' data graphs use different scales, and then purport to compare data in the graphs with

20   different scales. Other data graphs show sampling events in the wrong sequence. Defendants'

21   graphs distort the data with a bias toward showing "problems" with TtEC's data when in fact none

22   exist.

23       70.    Defendants ignored scientific explanations for data variability, including soil

24   heterogeneity, distributional misspecification, outliers, and spatial variability. Defendants cited

25   data variability itself as evidence of potential data manipulation or falsification, even though data

26   variability is expected and consistent with Site conditions.

27       71.    Many of Defendants' tests and methods conflict with the work plans, Navy

28   specifications, and regulatory guidance documents that governed Plaintiff's work at the Site. For

example, Defendants' soil data evaluation conflicts with applicable Task Specific Plans. Defendants' building data evaluation conflicts with applicable Task Specific Plans and the 2013 RASO guidance document regarding building scan speed.

72.     Notwithstanding Defendants' contractual requirement to review Site documents and regulatory guidance, Defendants intentionally designed tests and methods that were inconsistent with the actual requirements governing Plaintiff's work at the Site.

73.     Defendants intentionally obfuscated their erroneous evaluation methods, including in the misleading box plots and data graphs, and convinced the Navy and regulatory agencies that Plaintiff's data and work were unreliable.

74.     Notwithstanding provisions in CTO FZ12 requiring specific scientific expertise for the data evaluation, Defendants' key personnel did not have the requisite expertise to evaluate Plaintiff's data or work.

75.     Defendants knew their evaluation was biased, arbitrary, and incorrect. Defendants knew their evaluation would mislead the Navy, causing the Navy to believe TtEC had not done its work properly. Defendants knew, or reasonably should have known, their conduct would cause the Navy to stop paying TtEC for its work and breach its contracts with TtEC. Defendants knew the Navy then would hire Defendants to conduct investigation and remediation work at the Site.

**H.     CH2M'S CONFLICT OF INTEREST**

76.     CH2M is a direct competitor of Plaintiff. CH2M and Plaintiff compete for similar work from the Navy. From 2008 to 2020, each were awarded approximately $415 million in Navy contracts.

77.     CH2M had reason to undermine Plaintiff's data to gain an unfair competitive advantage over Plaintiff and take work away from Plaintiff.

78.     CH2M was motivated to find issues with Plaintiff's data because CTO FZ12 included confirmation fieldwork to be done following the data evaluation, should the evaluation identify problematic data. Thus, the more allegedly unreliable data Defendants found, the more confirmation fieldwork, rework, and profit CH2M would secure in the future.

79.     CH2M's Final Parcel G Removal Site Evaluation Work Plan, Former Hunters

Point Naval Shipyard, San Francisco, CA, June 2019 (Parcel G Work Plan)[5] evidences CH2M's motive. The Parcel G Work Plan is designed to trigger a complete re-do of Plaintiff's work at Parcel G. The rework will benefit CH2M and its subcontractors, not the environment.

80.     Defendants will also conduct confirmation surveys and/or rework across the Site, with estimated payments exceeding $200 million dollars over the course of the next five years or so.

81.     Navy contracting officers are required to mitigate potential organizational conflicts of interest (OCIs), but failed to do so here. *See* Federal Acquisition Regulation 48 C.F.R. § 9.504(a). Despite these contracting requirements, and the fact that the Navy sought an "independent third-party evaluation" of Plaintiff's data, the Navy did not perform any documented evaluation of CH2M's potential OCIs prior to awarding CTO FZ12.

82.     CTO FZ12 and applicable regulations required CH2M to evaluate organizational, personnel, and personal potential conflicts of interest and make disclosures to the Navy if a potential conflict is identified. CH2M violated these requirements by failing to evaluate and notify the Navy of potential conflicts of interest, including its impaired objectivity, inability to render impartial advice, and other competing interests. *See* 48 C.F.R. §§ 3.1100, 9.500.

**I.     THE NAVY'S BREACH OF ITS CONTRACTS WITH PLAINTIFF**

83.     As a result of Defendants' biased and unscientific data evaluation, the Navy breached its contracts with Plaintiff.

84.     On January 24, 2018, the Navy informed Plaintiff it was refusing payment on invoices under Contract N62473-10-D-0809, Task Order 0002 and Contract N62473-12-D-2006, Task Order 0004 because of potential data manipulation and/or falsification allegedly identified in Plaintiff's site data. The Navy's refusal to pay Plaintiff for its work occurred soon after Defendants shared their data evaluation with the Navy.

85.     On January 30, 2018, the Navy rejected additional invoices for payment under

---

[5] The Parcel G Work Plan is available for download here:
https://www.bracpmo.navy.mil/brac_bases/california/former_shipyard_hunters_point/documents1.html#ParcelG

Contract N62473-10-D-0809, Task Order 0012.

86.     Plaintiff suffered losses due to the Navy's breach of these contracts totaling nearly $700,000.

87.     In December 2019, the Navy unilaterally suspended work on Contract N62473-10-D-0809, Task Order 0007, making further performance by TtEC under the contract impossible.

**J.      PLAINTIFF'S DISCOVERY OF DEFENDANTS' MISCONDUCT**

88.     Plaintiff did not know the results of Defendants' data evaluation until May 2018, when the Navy gave copies of the Draft Reports to Plaintiff.

89.     Plaintiff did not discover or know facts causing it to suspect that Defendants' wrongful conduct had caused Plaintiff harm until much later.

90.     The Draft Reports contain evidence of the tests and methods used in Defendants' data evaluation, including thousands of pages of addenda which describe and apply Defendants' tests and methods using charts, box plots, and other data graphs.

91.     Defendants obfuscated their tests and methods in the voluminous addenda and misleading graphs. Their obfuscation delayed Plaintiff's discovery of Defendants' misconduct.

92.     Plaintiff received information alerting it to Defendants' intentional misconduct and conflicts of interest in or about November 2019.

**VI.      PLAINTIFF'S DAMAGES**

93.     As a result of Defendants' misconduct, Plaintiff lost revenues from and contracts with the Navy, and its business relationship with the Navy was harmed.

94.     The Navy relied on Defendants' misconduct, which cast doubt on Plaintiff's data, in refusing to pay amounts owed to TtEC under its contracts with TtEC.

95.     The Navy relied on Defendants' misconduct in issuing negative evaluations concerning Plaintiff's work at the Site.

96.     The Navy's negative evaluations caused TtEC to lose other Navy contracts and task orders, even when TtEC submitted significantly lower pricing proposals, which absent the negative evaluations, TtEC likely would have won.

97.     Because of Defendants' misconduct, the Navy suspended TtEC's work on Contract

N62473-10-D-0809, Task Order 0007, making it impossible for TtEC to complete its performance under the contract. The Navy's suspension of the contract caused TtEC to lose profits it reasonably expected to earn.

98. The Navy relied on Defendants' misconduct in refusing to allow TtEC to perform work at Hunters Point and/or to cure any alleged deficiencies.

## **FIRST CAUSE OF ACTION**

### **(Inducing Breach of Contract – Against All Defendants)**

99. Plaintiff re-alleges and incorporates by reference the preceding paragraphs as though set forth fully herein.

100. Plaintiff and the Navy entered into valid contracts and task orders for environmental remediation at Hunters Point, including Contract N62472-10-D-0809, Task Orders 0002, 0007, and 0012, and Contract N62473-12-D-2006, Task Order 004.

101. Defendants knew about the contracts between TtEC and the Navy. CH2M's contract with the Navy, CTO FZ12, referenced the TtEC-Navy contracts. Defendants knew, based on their experience contracting with the Navy, that for TtEC to perform work at the Site, TtEC must have contracts with the Navy.

102. Defendants intended to cause the Navy to breach its contracts with TtEC. At the December 13, 2016 Scoping Meeting, CH2M said its tests would be *designed* to find issues with Plaintiff's data, even if statistical analysis did not. Defendants knew, or reasonably should have known, that undermining TtEC's data and work would cause the Navy to breach its contracts with TtEC. Defendants intended the Navy to believe Plaintiff's data and work were unreliable, so Defendants would be hired to perform testing and rework at the Site.

103. CH2M intended to repair its own reputation, which was damaged by its previous air monitoring violations at Hunters Point, by incorrectly and negatively evaluating TtEC's data.

104. Defendants knew they stood to profit from negative findings about TtEC's data. CH2M's contract grew after Defendants' data evaluation found potential data manipulation or falsification in TtEC's data, even though TtEC's data are reliable.

105. Defendants had performed some limited remediation work at the Site. Defendants

1  knew if they undermined TtEC's work, they stood to be awarded contracts for investigation,

2  remediation, and other work at the Site, including rework in the areas where TtEC had worked.

3      106.    Defendants reaped millions of dollars for their biased and unscientific data

4  evaluation. As a result of their misconduct, Defendants have contracted with the Navy to complete

5  unnecessary investigations and rework at Hunters Point.

6      107.    Defendants' actions induced the Navy to breach its contracts with Plaintiff. Shortly

7  after Defendants shared their data evaluation with the Navy, the Navy breached its contracts with

8  TtEC by failing to pay TtEC for work already completed. The Navy also unilaterally suspended

9  TtEC's work under Contract N62473-10-D-0809, Task Order 0007, making performance

10 impossible.

11     108.    TtEC was harmed and suffered damages as a direct result of Defendants' conduct

12 when the Navy refused to pay amounts owed to TtEC for work already performed by TtEC.

13     109.    Defendants' conduct was a substantial factor in the Navy's decision to breach its

14 contracts with TtEC.

15                        **SECOND CAUSE OF ACTION**

16      (**Intentional Interference with Contractual Relations – Against All Defendants**)

17     110.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs as

18 though set forth fully herein.

19     111.    Plaintiff and the Navy entered into valid contracts and task orders for

20 environmental remediation at Hunters Point, including Contract N62472-10-D-0809, Task Orders

21 0002, 0007, and 0012, and Contract N62473-12-D-2006, Task Order 004.

22     112.    Defendants knew about the contracts between TtEC and the Navy. CH2M's

23 contract with the Navy, CTO FZ12, referenced the TtEC-Navy contracts. Defendants knew, based

24 on their experience contracting with the Navy, that for TtEC to perform work at the Site, TtEC

25 must have contracts with the Navy.

26     113.    Defendants intentionally, with knowledge or willful blindness, conducted a biased

27 and flawed evaluation of Plaintiff's data and work. Defendants designed tests to find Plaintiff's

28 data unreliable, when in fact, the data are reliable and TtEC's work at the Site was done correctly.

114.     Defendants intentionally, with knowledge or willful blindness, manufactured findings of potential data manipulation and/or falsification, intending to mislead the Navy into wrongly believing Plaintiff's work was not done correctly.

115.     Defendants intended, or were willfully blind to the fact, that their biased and flawed data evaluation would cause the Navy to distrust Plaintiff and would disrupt the Navy and Plaintiff's performance of their contracts.

116.     Defendants knew, or reasonably should have known, that their biased and flawed data evaluation would disrupt the TtEC-Navy contracts and prevent performance of contractual obligations. Defendants knew, or reasonably should have known, that their flawed negative findings would make performance of the Navy and Plaintiff's contracts more expensive and difficult, if not impossible.

117.     Defendants' biased and flawed data evaluation prevented Plaintiff's performance of its contracts with the Navy because the Navy suspended performance of Contract N62473-10-D-0809, Task Order 0007, refused to pay Plaintiff for work performed under certain contracts, and refused allow Plaintiff to cure any alleged defects in its performance of the contracts.

118.     Defendants' biased and flawed data evaluation also caused the Navy to refuse to award additional contracts or task orders to Plaintiff for work at the Site.

119.     Plaintiff suffered harm when the Navy stopped payment, suspended an existing contract, and did not allow TtEC to conduct remediation or other work at the Site. Plaintiff suffered harm from the Navy's negative evaluation of its performance, which was based on Defendants' flawed data evaluation. Defendants' flawed data evaluation was a substantial factor in causing harm to Plaintiff. The Navy has said it distrusts Plaintiff's Site data, and because of this mistrust, Plaintiff has been precluded from conducting work at the Site.

## **THIRD CAUSE OF ACTION**

### **(Negligence – Against All Defendants)**

120.     Plaintiff re-alleges and incorporates by reference the preceding paragraphs as though set forth fully herein.

121.     "[W]here the 'end and aim' of the contractual transaction between a defendant and

the contracting party is the achievement or delivery of a benefit to a known third party or the protection of that party's interests, then liability will be imposed on the defendant for his or her negligent failure to carry out the obligations undertaken in the contract even though the third party is not a party thereto." *Glenn K. Jackson Inc. v. Roe*, 273 F.3d 1192 (9th Cir. 2001).

122.   The objective of Defendants' work under CTO FZ12 was to evaluate and confirm Plaintiff's data if the data are reliable. If Defendants had performed their evaluation honestly and correctly, they would have confirmed that Plaintiff's data are reliable.

123.   Therefore, the "end and aim" of CTO FZ12 was to achieve a benefit for Plaintiff, a known third party. TtEC stood to benefit from the data evaluation because, if Defendants had done an unbiased, scientific, and correct evaluation, they would have confirmed the reliability of TtEC's data and work, and TtEC would have received payment for invoices that the Navy has instead rejected.

124.   Defendants owed a duty to Plaintiff to exercise reasonable and ordinary care when evaluating and confirming Plaintiff's data to avoid causing unwarranted economic or other injury to Plaintiff.

125.   Defendants breached their duty to Plaintiff by conducting a biased, arbitrary, and unscientific evaluation of Plaintiff's data, which undermined the work Plaintiff did at the Site. Defendants' negligence has negatively impacted Plaintiff and caused it substantial harm. Plaintiff's harm is a direct and proximate result of the Defendants' negligence.

126.   Defendants held themselves out as having the unique scientific and statistical evaluation knowledge necessary to adequately evaluate Plaintiff's data, when in fact, Defendants were unable to provide an unbiased, scientific, and statistically sound evaluation of Plaintiff's data.

127.   Defendants breached the professional standard of care by designing and inconsistently applying tests and methods that were subjective, outcome-oriented, biased, and not grounded in science or the regulatory requirements applicable to the Site.

128.   Defendants knew, or should have known, that their failure to correctly evaluate Plaintiff's data and work could result in harm to Plaintiff. Accordingly, it was foreseeable that

1    Defendants' conduct, which did not meet the standard of care, could harm Plaintiff.

2        129.    As a result of Defendants' negligence, Plaintiff suffered harm. Defendants'

3    negligence was a substantial factor in the harm Plaintiff suffered, the full extent of which will be

4    determined at trial.

5                            **FOURTH CAUSE OF ACTION**

6            (**Equitable Indemnification and/or Contribution – Against All Defendants**)

7        130.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs as

8    though set forth fully herein.

9        131.    Due to Defendants' inducement, interference, and misconduct, Plaintiff has been

10   named in multiple lawsuits, including lawsuits brought by the current and future developers of

11   certain Hunters Point parcels. These lawsuits generally allege, *inter alia*, that Plaintiff failed to

12   properly investigate, test, and remediate the Site and engaged in widespread data manipulation

13   and/or falsification during its work at the Site and, thus, transfer of Hunters Point parcels to the

14   developers was delayed. Other lawsuits brought by individuals living and working near the Site

15   allege fear of cancer claims based on alleged contamination remaining at the Site.

16       132.    Plaintiff denies it failed to properly investigate, test, and remediate the Site. When

17   the wrongful conduct of a small number of employees and subcontractors was discovered,

18   Plaintiff took immediate action to correct the wrongdoing and investigate and remediate the

19   identified areas in consultation with the Navy. Plaintiff rejected all suspect data identified during

20   the investigation and no remediation decisions were made based on the rejected data. Plaintiff

21   denies liability for any alleged "potential" data manipulation or falsification asserted by

22   Defendants.

23       133.    To the extent Plaintiff is held liable for, *inter alia*, purported delay in transfer of

24   Hunters Point parcels to the developers, Defendants are successive tortfeasors because their biased

25   and flawed evaluation of Plaintiff's data contributed to and exacerbated alleged delays in transfer

26   of parcels to the developers. The actions of Plaintiff (if at all) and Defendants combined to create

27   the developers' purported damages arising from the alleged delay in transfer of Site parcels.

28       134.    To the extent Plaintiff is held liable for, *inter alia*, fear of cancer claims,

Defendants are successive tortfeasors because their biased and flawed evaluation of Plaintiff's data contributed to and exacerbated the alleged fear of cancer.

135.    Plaintiff is entitled to equitable indemnification and/or contribution from Defendants for its costs incurred in defending against claims of data unreliability arising from Defendants' incorrect findings regarding Plaintiff's data.

136.    If liability against Plaintiff should be established in any action as a result of Defendants' wrongful conduct, where liability is expressly denied by Plaintiff, Defendants are obligated to indemnify Plaintiff from and against any and all claims, losses, damages, attorneys' fees, judgments, and settlement expenses incurred as a result of Defendants' failure to correctly evaluate Plaintiff's data and work.

137.    As a result of Defendants' improper conduct, Plaintiff has incurred and continues to incur attorneys' fees and costs in responding to claims predicated upon Defendants' actions, in an amount to be determined at trial.

### **FIFTH CAUSE OF ACTION**

### **(Unfair Competition Law (Bus. & Prof. Code §§ 17200 et seq.) – Unfair Business Act or Practice – Against All Defendants)**

138.    Plaintiff re-alleges and incorporates by reference the preceding paragraphs as though set forth fully herein.

139.    Plaintiff is a business in the field of environmental investigation and remediation.

140.    Defendants are business competitors of Plaintiff. *See Cel-Tech Commc'ns, Inc. v. L.A. Cellular Tel. Co.*, 20 Cal.4th 163, 973 P.2d 527 (1999); *Luxul Tech., Inc. v. Nectarlux, LLC*, 78 F.Supp.3d 1156, 1174 (N.D. Cal. 2015).

141.    Defendants engaged in unfair business acts or practices by conducting their data evaluation in a manner designed to cause the Navy to conclude Plaintiff's data were unreliable. Defendants did so with the intention, in whole or part, of disrupting Plaintiff's relationship with the Navy by unfairly and baselessly finding Plaintiff's data unreliable, so Defendants, as business competitors of Plaintiff, would obtain an unfair competitive advantage over Plaintiff. Defendants in fact did obtain an unfair competitive advantage over Plaintiff by the means alleged herein.

142.    Defendants' conduct alleged herein significantly threatens or harms competition.

143.    Plaintiff suffered economic and competitive injuries, including unpaid Navy invoices, loss of business, and other losses of money and property, as a result of Defendants' unfair business practices.

144.    Defendants' unfair business acts and practices are ongoing. Plaintiff seeks declaratory relief to remedy Defendants' unfair business acts and practices.

## VII.    PRAYER FOR RELIEF

Plaintiff prays for relief as follows:

A.    For compensatory and special damages according to proof at trial;

B.    For equitable indemnification and/or contribution;

C.    As to the Fifth Cause of Action, for declaratory relief;

D.    For equitable relief;

E.    For costs of suit;

F.    For interest at the maximum legal rate;

G.    For any and all other relief the Court deems just and proper.

## VIII.   JURY DEMAND

Plaintiff demands a jury trial.

DATED:  February 8, 2021                     HANSON BRIDGETT LLP


By:      /s/ *Davina Pujari*
         _____
         DAVINA PUJARI
         CHRISTOPHER A. RHEINHEIMER
         SAMIR J. ABDELNOUR
         MELISSA M. MALSTROM
         Attorneys for Tetra Tech EC, Inc.