1  BLANCA F. YOUNG (State Bar No. 217533)
   blanca.young@mto.com
2  JAVIER KORDI (State Bar No. 348358)
   javier.kordi@mto.com
3  MUNGER, TOLLES & OLSON LLP
   560 Mission Street, Twenty-Seventh Floor
4  San Francisco, California 94105-3089
   Telephone:    (415) 512-4000
5  Facsimile:    (415) 512-4077

6  JOHN W. SPIEGEL (State Bar No. 78935)
   john.spiegel@mto.com
7  JENNIFER L. BRYANT (State Bar No. 293371)
   jennifer.bryant@mto.com
8  MUNGER, TOLLES & OLSON LLP
   350 South Grand Avenue
9  Fiftieth Floor
   Los Angeles, California 90071-3426
10 Telephone:    (213) 683-9100
   Facsimile:    (213) 687-3702
11
   Attorneys for Defendant CH2M HILL, INC.
12

13              **UNITED STATES DISTRICT COURT**

14    **NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION**

15

16 TETRA TECH EC, INC.,                    | Case No. 3:20-cv-04704-JD

17              Plaintiff,                 | **DEFENDANTS' CORRECTED NOTICE OF MOTION AND MOTION FOR SUMMARY JUDGMENT PURSUANT TO FED. R. CIV. P. 56; MEMORANDUM OF POINTS AND AUTHORITIES**

18          vs.

19 CH2M HILL, INC., BATTELLE MEMORIAL INSTITUTE, CABRERA SERVICES, INC., PERMA-FIX ENVIRONMENTAL SERVICES, INC., and SC&A, INC.,

20

21

                                           *Filed concurrently with (1) Defendants' Request for Judicial Notice; (2) Declaration of Blanca F. Young; and (3) [Proposed] Order*

22              Defendants.                | Date:    Thursday, October 5, 2023
                                           | Time:    10:00 a.m.
23                                         | Ctrm:    11, 19th Floor
                                           | Judge:   Hon. James Donato
24
                                           | Trial Date: None Set
25

26

27

28

## NOTICE OF MOTION AND MOTION

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on Thursday, October 5, 2023, at 10:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom 11 of the above-entitled Court, located at 450 Golden Gate Avenue, San Francisco, California, before the Honorable James Donato, Defendants CH2M Hill, Inc. ("CH2M"); Battelle Memorial Institute ("Battelle"); Cabrera Services, Inc. ("Cabrera"); Perma-Fix Environmental Services, Inc. ("Perma-Fix"); and SC&A, Inc. ("SC&A," and collectively with CH2M, Battelle, Cabrera, and Perma-Fix, "Defendants") will, and hereby do, move pursuant to Rule 56 of the Federal Rules of Civil Procedure for an order granting summary judgment in Defendants' favor on Plaintiff Tetra Tech EC, Inc.'s remaining causes of action for inducing breach of contract and intentional interference with contractual relations.  Defendants move for summary judgment on the ground that there is no genuine issue as to any material fact, and Defendants are entitled to judgment as a matter of law.

As a threshold matter, both of Plaintiff's causes of action are barred by the operative two-year statute of limitations.  *See* Cal. Civ. Proc. Code § 339(1).  Plaintiff's causes of action accrued no later than January 2018, by which time it was already aware of not only the Navy's alleged breach and suspension of its contracts, but also Defendants' draft reports that allegedly induced those disruptions of the contracts.  Despite being on actual notice of its causes of action in January 2018, Plaintiff did not file this suit until July 14, 2020—several months after expiration of the two-year limitations period.

The causes of action also fail on the merits.  The inducement of breach cause of action survived Defendants' Motion to Dismiss only because Plaintiff argued that the Navy's suspension of Plaintiff's work was a breach.  Plaintiff has since abandoned that argument, and case law confirms the Navy's suspension of work is not a breach as a matter of law.  The intentional interference with contractual relations cause of action also fails on the merits because, as discovery has confirmed, Plaintiff's contracts with the Navy could be terminated at the Navy's convenience.  This indisputable fact means Plaintiff had no legal assurance of an ongoing contractual relationship with the Navy and must prove an independently wrongful act to prevail on its contractual interference cause of action.

1   *See Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130, 1148 (2020).  Because Plaintiff has no

2   independently viable cause of action against Defendants and has pled no independently wrongful

3   act, it lacks the requisite predicate for its interference cause of action and Defendants are entitled to

4   summary judgment.

5        This Motion is based upon this Notice of Motion and Motion, the following Memorandum

6   of Points and Authorities, the concurrently filed Declaration of Blanca F. Young and exhibits

7   thereto, the concurrently filed Request for Judicial Notice, any papers filed in reply, all other papers

8   and records on file in this action, and such other evidence or argument presented to the Court at or

9   prior to any hearing on this Motion.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION...................................................................................................1

II.     STATEMENT OF UNDISPUTED FACTS .........................................................3

    A.      The Navy's Retention of Tetra Tech........................................................3

    B.      The Discovery of Tetra Tech's Fraudulent Conduct................................4

    C.      The Navy's Evaluation of Tetra Tech's Data...........................................5

    D.      The Navy's Withholding of Final Payments on Tetra Tech's Invoices and
        Suspension of Work Under CTO 7 ..........................................................5

    E.      Tetra Tech's Knowledge of the Draft Reports ........................................8

    F.      The Present Litigation ...........................................................................12

III.    SUMMARY JUDGMENT STANDARD ...........................................................14

IV.     ARGUMENT ....................................................................................................14

    A.      Tetra Tech's Causes of Action Are Time-Barred .................................15

        1.      The Statute of Limitations Expired by January 2020.................15

        2.      The Discovery Rule Does Not Save Tetra Tech's Causes of Action...........17

    B.      Tetra Tech's Causes of Action Fail as a Matter of Law.........................20

        1.      The Cause of Action for Inducing Breach Fails Because the Navy's
            Suspension Did Not Constitute a Breach of Contract ................20

        2.      The Intentional Interference Cause of Action Fails Because Tetra
            Tech Does Not and Cannot Identify Any Independently Wrongful
            Act ...............................................................................................23

V.      CONCLUSION ................................................................................................25

1

# **TABLE OF AUTHORITIES**

2

**Page(s)**

3

**FEDERAL CASES**

4

*All Am. Healthcare Servs., Inc. v. Beecan Health CT, LLC*,

5
    2023 WL 4676850 (C.D. Cal. June 23, 2023) ........................................................................25

6

*Anagnostellis v. Pitney Bowes Inc.*,
    2013 WL 8840335 (C.D. Cal. Mar. 5, 2013) .........................................................................14

7

*Anderson v. Liberty Lobby, Inc.*,

8
    477 U.S. 242 (1986) ..............................................................................................................14

9

*Boarhog LLC v. United States*,

10
    129 Fed. Cl. 130 (2016) .........................................................................................................24

11

*Broome Const., Inc. v. United States*,
    203 Ct. Cl. 521 (1974) ...........................................................................................................22

12

*C.E. Servs., Inc. v. Control Data Corp.*,

13
    759 F.2d 1241 (5th Cir. 1985) ...............................................................................................23

14

*Celotex Corp. v. Catrett*,

15
    477 U.S. 317 (1986) ..............................................................................................................14

16

*Crowley v. Peterson*,
    206 F. Supp. 2d 1038 (C.D. Cal. 2002) .........................................................................15, 16

17

*DC Comics v. Pac. Pictures Corp.*,

18
    938 F. Supp. 2d 941 (C.D. Cal. 2013) ..................................................................................16

19

*Factory Direct Wholesale, LLC v. iTouchless Housewares & Prods., Inc.*,

20
    411 F. Supp. 3d 905 (N.D. Cal. 2019) ..................................................................................16

21

*Forcier v. Microsoft Corp.*,
    123 F. Supp. 2d 520 (N.D. Cal. 2000) ...........................................................................15, 16

22

*G.L. Christian & Assocs. v. United States*,

23
    312 F.2d 418 (Ct. Cl. 1963) ..................................................................................................13

24

*Gonzales Commc'ns, Inc. v. Titan Wireless, Inc.*,
    2005 WL 8173198 (S.D. Cal. July 11, 2005) .......................................................................20

25

*Harmon v. Nelson*,

26
    2022 WL 254344 (N.D. Cal. Jan. 27, 2022) .........................................................................15

27

*hiQ Labs, Inc. v. LinkedIn Corp.*,

28
    31 F.4th 1180 (9th Cir. 2022) ...............................................................................................15

1

**TABLE OF AUTHORITIES**
(Continued)

2

3

**Page(s)**

*Holloway Const. Co. v. United States*,
    4 Cl. Ct. 779 (1984) ..................................................................................................23

*John A. Johnson & Sons, Inc. v. United States*,
    180 Ct. Cl. 969 (1967) ..............................................................................................23

*John Reiner & Co. v. U.S.*,
    163 Ct. Cl. 381 (1963) ....................................................................................3, 24, 25

*Johnson & Sons Erectors Co. v. United States*,
    231 Ct. Cl. 753 (1982) ...........................................................................................2, 22

*Lee v. United States*,
    130 Fed. Cl. 243 (2017), *aff'd sub nom. Lee v. United States*, 895 F.3d 1363
    (Fed. Cir. 2018) .........................................................................................................13

*Louis Leustek & Sons, Inc. v. United States*,
    41 Fed. Cl. 657 (1998), *aff'd*, 215 F.3d 1347 (Fed. Cir. 1999) ................................22

*Madera Irr. Dist. v. Hancock*,
    985 F.2d 1397 (9th Cir. 1993) ..................................................................................25

*Nano-Second Tech. Co. v. Dynaflex Int'l*,
    2013 WL 1855828 (C.D. Cal. May 1, 2013) ............................................................16

*Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*,
    210 F.3d 1099 (9th Cir. 2000) ..................................................................................14

*In re Oracle Corp. Sec. Litig.*,
    627 F.3d 376 (9th Cir. 2010) ....................................................................................14

*In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*,
    167 F. App'x 662 (9th Cir. 2006) ..............................................................................14

*R Power Biofuels, LLC v. Chemex LLC*,
    2017 WL 1164296 (N.D. Cal. Mar. 29, 2017) .........................................................19

*Rotiske v. Klemm*,
    140 S. Ct. 355 (2019) ................................................................................................17

*Soremekun v. Thrifty Payless, Inc.*,
    509 F.3d 978 (9th Cir. 2007) ....................................................................................14

*Triax-Pac. v. Stone*,
    958 F.2d 351 (Fed. Cir. 1992) ..................................................................................22

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' CORRECTED MOTION FOR SUMMARY JUDGMENT

1

**TABLE OF AUTHORITIES**
**(Continued)**

2

**Page(s)**

3

*United States v. Hubbard*,
    No. 4:17-cr-00278-JD (N.D. Cal. May 18, 2017), Dkt. No. 8 ....................................5

4

5

*United States v. Rolfe*,
    No. 4:17-cr-00123-JD (N.D. Cal. Mar. 15, 2017), Dkt. No. 7 ....................................5

6

7

*White Buffalo Const., Inc. v. United States*,
    101 Fed. Cl. 1 (2011), *aff'd in part, vacated in part, remanded by* 546 F. App'x
    952 (Fed. Cir. 2013) .................................................................................................21

8

9

*Winding Creek Solar LLC v. Peevey*,
    293 F. Supp. 3d 980 (N.D. Cal. 2017), *aff'd sub nom. Winding Creek Solar LLC
    v. Peterman*, 932 F.3d 861 (9th Cir. 2019) ...........................................................14

10

11

**STATE CASES**

12

*1-800 Contacts, Inc. v. Steinberg*,
    107 Cal. App. 4th 568 (2003) ...................................................................................14

13

14

*Fox v. Ethicon Endo-Surgery, Inc.*,
    35 Cal. 4th 797 (2005) .................................................................................17, 18, 19

15

16

*Ixchel Pharma, LLC v. Biogen, Inc.*,
    9 Cal. 5th 1130 (2020) ...............................................................2, 13, 23, 24, 25

17

*Jolly v. Eli Lilly & Co.*,
    44 Cal. 3d 1103 (1988) ...............................................................................17, 18, 20

18

19

*Korea Supply Co. v. Lockheed Martin Corp.*,
    29 Cal. 4th 1134 (2003) .......................................................................................24, 25

20

21

*NBCUniversal Media, LLC v. Superior Ct.*,
    225 Cal. App. 4th 1222 (2014) ...............................................................................18

22

*Norgart v. Upjohn Co.*,
    21 Cal. 4th 383 (1999) .................................................................................17, 18, 19

23

24

*Pac. Gas & Elec. Co. v. Bear Stearns & Co.*,
    50 Cal. 3d 1118 (1990) ...........................................................................................14

25

*Sonberg v. MacQuarrie*,
    112 Cal. App. 2d 771 (1952) ...................................................................................16

26

*Trembath v. Digardi*,
    43 Cal. App. 3d 834 (1974) .....................................................................................15

27

28

DEFENDANTS' CORRECTED MOTION FOR SUMMARY JUDGMENT

1

**TABLE OF AUTHORITIES**
(Continued)

2

**Page(s)**

3

*Vaca v. Wachovia Mortg. Corp.*,
    198 Cal. App. 4th 737 (2011) ................................................................................16

4

5

**FEDERAL STATUTES**

6

41 U.S.C. § 7103(c)(1) ........................................................................................21

7

**STATE STATUTES**

8

California Civil Procedure Code § 339(1) ...................................................15, 17

9

**FEDERAL RULES**

10

Fed. R. Civ. P. 56 ...................................................................................... *passim*

11

**FEDERAL REGULATIONS**

12

48 C.F.R. § 33.210 ..............................................................................................21

13

48 C.F.R. § 52.242-14 .........................................................................................21

14

48 C.F.R. § 52.242-14(b) .....................................................................................22

15

**OTHER AUTHORITIES**

16

*Appeal of TDC Mgmt. Corp.*, DOTCAB No. 1802, 88-1 B.C.A. (CCH) ¶ 20,242,
    (Oct. 27, 1987) ...............................................................................................21

17

18

*Appeal of D.H. Dave & Gerben Contracting Co.*,
    ASBCA No. 6257, 1962 B.C.A. (CCH) ¶ 3943 (Aug. 30, 1962) ............................23

19

20

*T.C. Bateson Const. Co.*,
    ASBCA No. 5492, 60-1 B.C.A. (CCH) ¶ 2552 (Mar. 16, 1960) ............................23

21

22

23

24

25

26

27

28

1

## MEMORANDUM OF POINTS AND AUTHORITIES

2

## I.  INTRODUCTION

3      This lawsuit represents a misguided effort by Plaintiff Tetra Tech EC Inc. ("Tetra Tech" or

4  "TtEC") to deflect blame from the scandal arising from its employees' falsification of data during

5  its radiological cleanup work for the United States Navy at the Hunters Point Naval Shipyard

6  ("Hunters Point" or "HPNS").  In response to the negative publicity and lawsuits resulting from its

7  employees' fraud, Tetra Tech brought this suit to point the finger at the Navy contractors hired in

8  the aftermath of the scandal to evaluate Tetra Tech's work.  But Tetra Tech has never had any viable

9  cause of action against Defendants, which discovery has now confirmed.

10      This Court dismissed most of Tetra Tech's causes of action against Defendants over a year

11  ago.  *See* Dkt. No. 91.  Only its causes of action for inducing breach of contract and for intentional

12  interference with contractual relations survived dismissal—and those causes of action survived

13  dismissal only because Tetra Tech's contracts with the Navy were not yet in the record.  *Id.* at 6-7.

14  Those contracts are now in the record before this Court.  In addition to producing the relevant

15  contracts, Tetra Tech was forced to respond to discovery about when and how the Navy allegedly

16  breached its contract with Tetra Tech, and when Tetra Tech discovered the facts giving rise to its

17  causes of action against Defendants here.  The evidence Tetra Tech produced is undisputed and

18  confirms that Tetra Tech's remaining causes of action are time-barred and baseless.

19      Both of Tetra Tech's causes of action fall outside the limitations period because they accrued

20  no later than January 2018, when Tetra Tech became aware of Defendants' draft reports that

21  allegedly induced the Navy to suspend Tetra Tech's work and withhold payments it allegedly owed

22  Tetra Tech.  Despite being on notice of its causes of action by January 2018, Tetra Tech waited until

23  July 14, 2020 to file suit—long after the two-year statute of limitations had expired.  In ruling on

24  Defendants' Motion to Dismiss, this Court declined to find Tetra Tech's causes of action time-

25  barred in light of Tetra Tech's allegation that "[i]n December 2019, the Navy unilaterally suspended

26  work."  *Id.* at 6 (quoting FAC ¶ 87).  While misleading allegations in Tetra Tech's amended

27  complaint suggested the December 2019 suspension was a new contract disruption giving rise to a

28  new cause of action, discovery has shown the December 2019 suspension was actually a

1   ***continuation*** of a suspension that began in December 2017.  Any interference cause of action

2   premised on the Navy's suspension of work is thus untimely.

3       Tetra Tech's causes of action also fail on the merits.  The cause of action for inducing breach

4   fails because there was no breach of contract within the limitations period, and an underlying breach

5   of contract is, of course, an essential prerequisite to a cause of action for inducing breach.  The sole

6   contractual breach alleged to have occurred within the limitations period is the aforementioned

7   December 2019 suspension of work.  Even if the December 2019 suspension of work were not a

8   continuation of an earlier suspension that occurred outside the limitations period, it does not

9   constitute a breach of contract and therefore cannot support an inducing breach claim.

10      The Court previously determined it could not deem this alleged suspension a valid exercise

11  of the Navy's rights under the contract because "the contract itself [was] not before the Court on

12  [Defendants'] pleading[] motion."  *Id.*  But that contract is now before the Court (Ex. 1),[1] and it

13  confirms the Navy had the express right to "suspend, delay, or interrupt all or any part of the work

14  of th[e] contract for the period of time that the Contracting Officer determines appropriate for the

15  convenience of the Government."  *Id.* (Contract N62473-10-D-0809, at Page 47 of 57

16  [TT_00161525]) (incorporating by reference Federal Acquisition Regulation ("FAR") 52.242-14).

17  The Navy's exercise of this right cannot be a breach as a matter of law.  *See, e.g.*, *Johnson & Sons*

18  *Erectors Co. v. United States,* 231 Ct. Cl. 753, 759 (1982) (government's work suspension pursuant

19  to a suspension-of-work clause "is not a breach and cannot be remediable as a breach").

20      Tetra Tech's cause of action for interference with contractual relations also fails on the

21  merits.  Such a cause of action might not require an *actual* breach, but where the contract is

22  terminable at will, a plaintiff must show the defendant's alleged interference was independently

23  wrongful—i.e., that it is "wrongful by some legal measure other than the fact of interference itself."

24  *See Ixchel Pharma,* 9 Cal. 5th at 1142.  Because the at-will nature of the Navy's contracts with Tetra

25  Tech was not "plainly visible on the face of the complaint," this Court declined to dismiss the

26  interference cause of action on the pleadings, but noted that "the 'at will' element, if established,

27

28

---

[1] "Ex." refers to exhibits to the declaration of Blanca F. Young filed in support of this motion.

1    may eventually warrant a dismissal." Dkt. No. 91 at 7.  The contracts now before the Court establish

2    that the Navy had the standard termination-for-convenience rights that are required in all federal

3    procurement contracts.  *See* Ex. 1 (Contract N62473-10-D-0809, at Page 47 of 57 [TT_00161525])

4    (incorporating by reference FAR 52.249-1 and FAR 52.249-2); Ex. 2 (Contract N62473-12-D-2006,

5    at Page 61 of 74 [TT_00160314]) (incorporating by reference FAR 52.249-2 and FAR 52.249-4).

6    Under these termination-for-convenience clauses in the Navy's contracts with Tetra Tech, "the

7    Government ha[d] the right to terminate 'at will'" as a matter of law.  *John Reiner & Co. v. U.S.*,

8    163 Ct. Cl. 381, 390 (1963).  With the at-will element now established beyond dispute, dismissal of

9    the interference cause of action is warranted, as this Court has already recognized.  *See* Dkt. No. 91

10   at 7.

11         Because Tetra Tech's causes of action are time-barred and fail on the merits as a matter of

12   law, the Court should grant summary judgment in favor of Defendants.

13   **II.**    **STATEMENT OF UNDISPUTED FACTS**

14         **A.**    **The Navy's Retention of Tetra Tech**

15         For more than three decades, the Navy operated a naval base at Hunters Point.  Dkt. No. 55

16   (FAC) ¶¶ 16-17.  Those operations resulted in radiological and other contamination at the site.  *Id.*

17   ¶¶ 19-20.  The Navy is responsible for cleaning up the site, and entered into a series of contracts

18   with Tetra Tech to assist with that work.  *Id.* ¶¶ 22-27.

19         Tetra Tech alleges Defendants tortiously interfered with four contract task orders ("CTOs")

20   awarded by the Navy:

21         • **CTO 2**, dated June 23, 2010, for cleanup of HPNS Parcel C.  *See* Ex. 3.

22         • **CTO 7**, dated September 22, 2010, for cleanup of HPNS Parcel E.  *See* Ex. 4.

23         • **CTO 12**, dated July 10, 2012, for Phase II cleanup of HPNS Parcel C.  *See* Ex. 5.

24         • **CTO 4**, dated September 19, 2012, for building cleanup in HPNS Parcel C.  *See* Ex. 6.

25   *See* FAC ¶¶ 84-87, 100-107, 111-117.  The contracts under which these CTOs were issued—

26   N62473-10-D-0809 and N62473-12-D-2006—set forth the applicable terms.[2]  Among many other

27   _____

28   [2] *See* Ex. 3 (CTO 2 at Section C ¶ 16, Page 8 of 55 [TT_00161820]) ("All contract clauses in the
     Basic Contract by reference or full text remain in effect unless superseded by this task order.");

clauses incorporated from the FAR, both contracts incorporate the FAR's standard termination-for-convenience clauses.  *See* Ex. 1 (Contract N62473-10-D-0809, at Page 47 of 57 [TT_00161525]) (incorporating by reference FAR 52.249-1 and FAR 52.249-2); Ex. 2 (Contract N62473-12-D-2006, at Page 61 of 74 [TT_00160314]) (incorporating by reference FAR 52.249-2 and FAR 52.249-4). Under these provisions, the Navy had the right to terminate the contracts "in whole or in part, when it is in the Government's interest."  *See* FAR 52.249-1 (Termination for Convenience of the Government (Fixed-Price) (Short Form)).[3]

Separately, both contracts also gave the Navy the right to "suspend, delay, or interrupt all or any part of the work of th[e] contract for the period of time that [it] [] determine[d] appropriate for the convenience of the Government."  *See* Ex. 1 (Contract N62473-10-D-0809, at Page 47 of 57 [TT_00161525]) (incorporating FAR 52.242-14); Ex. 2 (Contract N62473-12-D-2006, at Page 40 of 74 [TT_00160293]) (same).  The suspension-of-work provision further provides for an adjustment to the contract "for any increase in the cost of performance of this contract (excluding profit) necessarily caused by [an] unreasonable suspension, delay, or interruption," except that "no adjustment shall be made under this clause for any suspension, delay, or interruption to the extent that performance would have been so suspended, delayed, or interrupted by any other cause, including the fault or negligence of the Contractor, or for which an equitable adjustment is provided for or excluded under any other term or condition of this contract."  FAR 52.242-14(b).

## B.  The Discovery of Tetra Tech's Fraudulent Conduct

---

Ex. 4 (CTO 7 at Section 3.3 [TT_00162250]) ("All requirements of the base Contract, in addition to those specifically mentioned in this [CTO], remain in full effect and performance under this [CTO] shall be in accordance therewith."); Ex. 5 (CTO 12 at Section 3.2, Page 19 of 96 [TT_00162518]) ("All requirements of the basic contract, in addition to those specifically mentioned in this scope of work, remain in full effect and performance."); Ex. 6 (CTO 4 at Section 1 - General [TT_00160498]) ("All requirements of the Basic Contract, in addition to those specifically mentioned in this CTO, remain in full effect and performance under this CTO shall be in accordance therewith.").

[3] *See also* FAR 52.249-4 (Termination for Convenience of the Government (Services) (Short Form) (same); FAR 52.249-2 (Termination for Convenience of the Government (Fixed-Price)) ("The Government may terminate performance of work under this contract in whole or, from time to time, in part if the Contracting Officer determines that a termination is in the Government's interest.").

Concerns about the reliability of Tetra Tech's work began to surface in 2012, when the Navy observed "anomalous sampling results." FAC ¶ 29. In 2017, two Tetra Tech supervisors pled guilty to federal felonies for what Tetra Tech has euphemistically described as "irregular sampling." *Id.* ¶ 37. By the employees' own admission, however, this so-called "irregular sampling" amounted to illegal falsification of data by switching "clean dirt" for the soil Tetra Tech was supposed to be testing. *See* Ex. 7 at 3-4 [Plea Agmt., *United States v. Rolfe*, No. 4:17-cr-00123-JD (N.D. Cal. Mar. 15, 2017), Dkt. No. 7]; Ex. 8 at 3-4 [Plea Agmt. *United States v. Hubbard*, No. 4:17-cr-00278-JD (N.D. Cal. May 18, 2017), Dkt. No. 8]. Whistleblowers who worked for Tetra Tech subcontractors further alleged Tetra Tech's fraudulent conduct at Hunters Point was widespread. FAC ¶¶ 43-46.

**C.**   **The Navy's Evaluation of Tetra Tech's Data**

With the scandal at Hunters Point unfolding, the Navy assembled a "Tiger Team" to evaluate Tetra Tech's data. FAC ¶ 47. As part of this undertaking, on November 15, 2016, the Navy awarded Defendant CH2M Task Order FZ12 ("CTO FZ12"). *Id.* ¶ 48. Under CTO FZ12, CH2M was charged with "evaluat[ing] the integrity of data collected during past radiological investigation and cleanup activities at Hunters Point and determin[ing] if, where, and how follow-up data should be collected." *Id.* ¶ 50. To carry out this work, CH2M sub-contracted with Defendants Battelle, Cabrera, and Perma-Fix. *Id.* ¶ 49. Cabrera, in turn, sub-contracted with Defendant SC&A. Ex. 9 at 3 (Cabrera's Resp. to Interrog. No. 4). The "Tiger Team" also included representatives from the Navy, the EPA, the California Department of Toxic Substance Control ("DTSC"), the California Department of Public Health, the City of San Francisco, and Oregon State University. FAC ¶ 47.

Following its evaluation of Tetra Tech's data, Defendants prepared five draft, non-final reports. FAC ¶¶ 60-61. The reports are dated between September 2017 and March 2018 (*id.*) and contain preliminary findings of "potential" data falsification and manipulation (*id.* ¶ 63).

**D.**   **The Navy's Withholding of Final Payments on Tetra Tech's Invoices and Suspension of Work Under CTO 7**

**CTO 2 and CTO 4.** Over the course of 2017, Tetra Tech submitted its final invoices under CTO 2 and CTO 4 to the Navy. As of the date of these final invoices, the Navy had already paid Tetra Tech more than $12 million under CTO 2 and more than $6.7 million under CTO 4. *See*

Young Decl. ¶ 7, Ex. 10 at 1 (unpaid CTO 2 invoice); Ex. 10 at 2 (unpaid CTO 4 invoice).  The final invoices represented a small portion of the total value of each task order.  *See id.*; *see also* Ex. 11 at TT_03547818 (regarding CTO 4, discussed as "item 4(a)," noting "the Navy has already paid out $6,791,496 (93%) of the total contract").

The Navy rejected the final invoice for CTO 2 on January 4, 2017, the same day it was submitted, stating "[a]pproval to be withheld until rework is complete."  Ex. 12 at TT_01691892.  Tetra Tech re-submitted the invoice several times thereafter, and had an extended back-and-forth with the Navy about the invoice.  Ex. 13 at TT_01563968-71 (Tetra Tech letter outlining chronological history of the invoice between January 4, 2017 and October 19, 2017).  After Tetra Tech re-issued the invoice on September 5, 2017, the Navy's Lead Remedial Project Manager recommended the invoice for rejection "because uncompleted tasks [were] being billed," and the Navy formally rejected the invoice again on October 19, 2017.  *Id.* at TT_01563971.

With respect to CTO 4, the Navy rejected the final invoice on July 10, 2017, a month after it was submitted, stating: "This invoice is for the final 10% payment for field work.  Due to data quality issues with instrumentation, the performance objectives may not have been met.  Recommend retaining the final 10% until both parties can verify performance objectives were met and outstanding contract issues are resolved."  Ex. 14 at TT_01792900.  In a July 12, 2017 conference call and an email on August 8, 2017, the Navy reiterated its position that Tetra Tech "did not meet the performance objectives of the contract," explaining "[t]he lack of quality control information for many survey units makes the data insufficient for Final Status Survey data."  Ex. 11 at TT_03547820.  In a further call the Navy re-confirmed that "the Technical Team directed to hold payment . . . for re-negotiation."  *Id.* at TT_03547818.

In a letter dated November 28, 2017, Tetra Tech formally notified the Navy that it "strongly disagree[d] with the Navy's rejections of these invoices," demanded payment, and threatened legal action.  Ex. 13 at TT_01563968, 972, 976.

On January 24, 2018, the Navy responded to Tetra Tech's November 28, 2017 letter and explained why it was not making final payments:

Under normal circumstances, the Navy would discuss these items with TtEC and

> negotiate a final payment.  However, the acceptability of all TtEC radiological data is currently in question due to allegations that TtEC falsified data submitted to the Navy and regulatory agencies.  As TtEC is aware, there are ongoing Department of Justice investigations into the allegations regarding the nature and extent of TtEC's misrepresentation of data delivered to the Navy under several task orders, including the subject task orders . . . In addition to the pending investigations, the invoices for both CTO 0002 and 0004 are rejected because the Navy has determined that TtEC did not meet . . . portions of the performance objectives of both CTOs.

Ex. 15 at TT_01543785.  The Navy further advised that it had begun "an independent review of TtEC's radiological data," "at the insistence of the regulatory agencies (EPA and DTSC), the Mayor of San Francisco, and Congresswoman Nancy Pelosi (*id.*), and that "the issue of data validation pertains" to several CTOs, including the four at issue in this case—CTO 2, CTO 4, CTO 7, and CTO 12 (*id.* at TT_01543786).  The Navy concluded:  "[W]ithholding of final payment is necessary while the validity of the data is reviewed and deliverables are verified." *Id.* at TT_1543786.

**CTO 12.**  On November 8, 2017 and January 25, 2018, Tetra Tech submitted its final two invoices under CTO 12.  The Navy formally rejected those invoices on January 30, 2018, reiterating that "[w]ithholding of final payment is necessary while the validity of the data is reviewed and deliverables are verified."  Ex. 16 at TT_03547470-71.

**CTO 7.**  Meanwhile, on December 12, 2017, the Navy suspended Tetra Tech's work under CTO 7 in a written modification to the contract.  Ex. 17 (modification and cover letter regarding same).  The Navy advised Tetra Tech that it was suspending Tetra Tech's work "in accordance with FAR 52.242-14" (*see id.*), the suspension-of-work provision incorporated into the contract that allows the Navy to "order the Contractor, in writing, to suspend . . . all or any part of the work of th[e] contract for the period of time that the Contracting Officer determines appropriate for the convenience of the Government."  *See* FAR 52.242-14; Ex. 2 (Contract N62473-12-D-2006, at Page 40 of 74 [TT_00160293]) (incorporating FAR 52.242-14).

A few days later, Tetra Tech began preparing correspondence to the Navy to "acknowledge[] receipt" of the suspension of work and "reserve[] its right to an equitable adjustment."  Ex. 18 at TT_01564738 (internal draft as of December 20, 2017); Ex. 19 at TT_03493613 (internal correspondence regarding letter); Ex. 20 at TT_03766244 (final correspondence sent to Navy).  At the time of the suspension, the Navy had already paid Tetra Tech more than 99% of the value of

1   CTO 7.  *See* Young Decl. ¶ 7, Ex. 10 at 3 (invoice showing $11,139,098.80 in prior payments).

2          The December 2017 suspension of CTO 7 was set to expire on December 12, 2018 (Ex. 17),

3   but the Navy extended the suspension for another year on November 29, 2018 (Ex. 21 at

4   TT_00162366-367), and then again for another year on December 4, 2019 (Ex. 22 at TT_00162369-

5   370).  Each suspension notification provided there would be "no change in the scope or price as a

6   result of th[e] modification."  Ex. 22 at ¶ 4, TT_00162370; *see also* Ex. 17 at ¶ 3, TT_01736281;

7   Ex. 21 at ¶ 3, TT_00162367.

8          **E.      Tetra Tech's Knowledge of the Draft Reports**

9          As the Navy withheld final payments and suspended Tetra Tech's work under CTO 7, Tetra

10  Tech also learned about the draft reports.

11         By its own admission, Tetra Tech first became aware of the draft reports "[i]n or about

12  January 2018," when it "received an email from NBC Bay Area News containing a copy of

13  Greenaction's Petition to the Nuclear Regulatory Commission" that attached the September 2017

14  draft report (for Parcels B and G soil).  Ex. 23 at 11-12 (Second Suppl. Resp. to Interrog. No. 8);

15  *see also* Ex. 24 (January 18, 2018 email from NBC Bay Area News reporter to Tetra Tech attaching

16  petition); *id.* at TT_01462228 (draft report attached to petition); Ex. 26 at TT_01543777 (circulating

17  NBC Bay Area News Story); Ex. 27 (copy of NBC Bay Area News article regarding draft report).

18         After receiving the draft report on January 18, 2018, the President of Tetra Tech, Andrew

19  Bolt (Ex. 23 at 13), immediately reviewed it, made "several comments and notes," and reported that

20  he "found many holes in [the] draft report."  Ex. 25 (Bolt email at 2:17 am on January 19, 2018).

21         Soon thereafter, on January 24, 2018, Tetra Tech executive Kent Weingardt sent a letter to

22  Karen Barba, a contracting officer with the Navy, acknowledging receipt of the draft report from

23  the media and requesting copies of the other draft reports.  Ex. 28 at TT_01564341.  Internal drafts

24  of the letter also acknowledged that Tetra Tech "ha[d] been aware, through [its] continued contact

25  with the Navy, [] that th[e] report and evaluation was under development."  Ex. 29 at TT_01737038.

26  Just two days later, with the NBC story "starting to get legs," Tetra Tech prepared talking points.

27  Exs. 30-31.  Those January 26, 2018 talking points criticized the draft reports as containing

28  "discrepancies" (Ex. 30 at TT_03247753) and "speculative statements" (Ex. 31 at TT_03493875).

A few days later, after receiving a further media inquiry, Tetra Tech considered responding with "just enough information to sow doubt in the report" by providing the following statement: "[W]e did review the copy [of the draft report] you sent Tetra Tech and noticed several discrepancies and inaccuracies. . . . This is hardly a rigorous analysis of the data." Ex. 32 at TT_01564335.

By the end of January 2018, details about the draft reports and their conclusions were public knowledge, with additional news outlets reporting that the draft report "authored by contractors Battelle, Cabrera Services, CH2M, Perma-Fix Environmental Services, and SC&A Environmental Services and Consulting" concluded that "[a]lmost half of the work" done by Tetra Tech at Hunters Point was "suspect" or had "evidence of potential data manipulation or falsification." Ex. 33 (SF Curbed, January 26, 2018); *see also, e.g.*, Ex. 34 (SF Gate, January 26, 2018); Ex. 35 (Business Insider, January 28, 2018); Ex. 36 (San Francisco Chronicle, January 30, 2018).

On January 31, 2018, the Navy discussed the draft reports in a public meeting. Ex. 23 at 12 (Second Suppl. Resp. to Interrog. No. 8). After the meeting, Tetra Tech reviewed the posters the Navy presented at the meeting that summarized the data evaluation's methodology and findings. Exs. 37, 38. Bolt complained the Navy "appear[ed] to be making definitive statements based on a draft report" at the public meeting. Ex. 39. In response to the meeting, on February 5, 2018, Tetra Tech's outside counsel sent a letter to the Navy that, among other things, requested that the Navy not "address allegations relating to draft reports or findings" in future public statements. Ex. 40.

By February 2018, Tetra Tech was starting to inspect the draft reports even more closely. On February 6, 2018, Bolt asked employees to review the September 2017 draft report, "note what they're saying about questionable survey records," "compare those to our reports," and "plan to discuss" with Bill Brownlie, Tetra Tech's Chief Engineer. Ex. 41. The next week, Bolt circulated two additional draft reports (Ex. 42)—the Parcel C soil draft report dated November 2017 (*id.* at TT_01560091) and the Parcel E soil draft report dated December 2017 (*id.* at TT_01560166)— along with the previously circulated September 2017 draft report for discussion with employees (*id.* at TT_01560090). And by April 16, 2018—two years and three months before filing the complaint in this case—Tetra Tech had obtained copies of all five of the draft reports. *See id.*; Ex. 43 (April 4, 2018 email attaching draft building data report, dated March 2018, received from DOJ); Ex. 44

(April 16, 2018 email from Tetra Tech Senior Project Manager with subject line "Please Print" attaching additional draft report for Parcels D-2 and UCs, dated October 2017).

In early March 2018, Tetra Tech prepared a "client fact sheet" that addressed the draft reports. Ex. 45. Among other things, the "fact sheet" attacked the authors of the draft reports as "competitors of TtEC that have a clear conflict of interest" (*id.* at TT_01544063)—the same allegation that Tetra Tech has made in this litigation (FAC ¶¶ 77-78, Compl. ¶¶ 73-80). Bolt repeated these allegations in a meeting a few months later and in a draft email dated June 22, 2018, more than two years before Tetra Tech filed its original complaint. Young Decl. ¶ 39; Ex. 46 at TT_01580713. His email cites and quotes the FAR provision regarding organizational conflicts of interest that Tetra Tech relies upon in its complaint. *Compare* Ex. 46 *with* FAC ¶ 81, Compl. ¶ 78.

In the face of mounting public criticism and scrutiny related to the draft reports, in April 2018 Tetra Tech began responding publicly. On April 24, 2018, Sam Singer, the President of Tetra Tech's public relations firm, forwarded a story in the San Francisco Chronicle to various Tetra Tech executives and its *outside counsel of record in this litigation* with the note: "A very solid and good story for us . . . Thanks to all for the good work, coordination and messaging." Ex. 47 at TT_01544315. The article quoted Tetra Tech's Chief Engineer, Bill Brownlie, regarding Defendants' investigation and draft report: "As for the review conducted by the Navy's five consultants, Tetra Tech 'disagrees with the method they used.'" *Id.* at TT_01544317. The same article quotes Brownlie as saying the report's conclusion "doesn't make sense." *Id.* at TT_01544318. Bolt scheduled a call with several employees to "brief [them] on what's happening on Hunters Point" and directed them to the San Francisco Chronicle article for details in advance of the call. Ex. 48 at TT_01468287. The day after the article was published, on April 25, 2018, Tetra Tech held a press conference. At that press conference, Tetra Tech's Chief Engineer stated that Tetra Tech had "looked at the draft third-party reports that the Navy has prepared" and had "a lot of questions about them." Ex. 49 at 1:39 (TT_01373550).

The same month, Tetra Tech's General Counsel attended a "highly anticipated hearing" held by the San Francisco Board of Supervisors' Land Use and Transportation Committee to address the accusations of "fraudulent testing" during Tetra Tech's clean-up work at Hunters Point. Ex. 50 at

00:41-1:40 (City's official video recording of hearing).  Immediately before Tetra Tech's General

Counsel spoke at the hearing (*see id.* at 49:57), the Navy's representative explained that in response

to the accusations by former Tetra Tech employees that the company had engaged in "deliberate

falsification of tests, improper work, and fraudulent record-keeping" at Hunters Point, "the Navy

paused the program for a comprehensive review." *Id.* at 15:32.  The Navy's representative further

explained that the Navy "initiated and led a data evaluation and analysis effort from the group of

radiological experts," including "independent contractors." *Id.* at 15:43.  That data evaluation

"concluded that there were more problems with the Tetra Tech cleanup data at Hunters Point, which

created uncertainty in the overall work." *Id.* at 16:00.  The Navy's representative further explained

that the Navy's conclusion "was reinforced by a second data evaluation by the EPA, using a different

methodology." *Id.*  Tetra Tech's General Counsel was present when the Navy's representative made

these statements.  *See generally* Ex. 50; *see also* Ex. 51 (City's meeting minutes); Ex. 52 at

TT_00007488 at 510.

On May 1, 2018—still outside the two-year limitations period cutoff—the Navy sent Tetra

Tech a letter that "notif[ied]" Tetra Tech of the Navy's "dissatisfaction with Tetra Tech's

performance" under 16 CTOs, noting that "[t]he applicable regulatory agencies have revoked free

release certifications previously provided . . . and have otherwise indicated that Tetra Tech's data

collection work in support of the free release of the properties is suspect." Ex. 54 at TT_01462456-

57; Ex. 53 at TT_01791623 (email attaching letter).  The letter further explained that "[a]s a result

of [those] concerns, the Navy engaged a third party, CH2M Hill, to review Tetra Tech's data." Ex.

54 at TT_01462457.  The letter also enclosed the draft reports,[4] "although [the Navy] underst[ood]

Tetra Tech ha[d] previously been provided copies for review." *Id.*; *see also* Ex. 57 at TT_01544566

(follow-up May 2018 email thread regarding Navy's transmission of additional draft report—the

---

[4] Tetra Tech previously stated that "[t]he letter purported to attach the draft reports, but none were attached." Ex. 23 at 12 (Second Suppl. Resp. to Interrog. No. 8).  Discovery has revealed that "due to the size of the documents," the enclosures were transmitted via AMRDEC file transfer instead.  Ex. 53 at TT_01791623; Ex. 55 at TT_03299042 ("On May 7, 2018, [the Navy] received confirmation from [TtEC] that all of the documents had been successfully downloaded, and that TtEC had received the CD sent via FedEx."); Ex. 56 at TT_03713139 (Tetra Tech email reflecting download on May 7, 2018).

1  building report previously received from DOJ in April, Ex. 43—and showing Tetra Tech employee

2  confirming receipt via file transfer and CD);[5] *see also* FAC ¶ 88 (admitting the Navy "gave copies

3  of the Draft Reports to Plaintiff" in "May 2018").

4      In a follow-up letter dated June 14, 2018, Tetra Tech reiterated again that it "strongly

5  disagrees with CH2M Hill's technical methods, analyses, and findings."  Ex. 59 at TT_01736075;

6  *see also* Ex. 60 at TT_01544614 (internal chat thread among Tetra Tech employees, dated July 5,

7  2018, regarding the "consolidated comments on the Navy's HPNS reports" where an employee

8  stated she had not "worked on that for many weeks"); Ex. 61 at TT_01544616 (email dated July 9,

9  2018, in which Tetra Tech's Corporate Radiation Safety Officer outlined analysis of the data

10  "rejected in the Navy reports" to "demonstrate [the] so-called suspect HPNS data is actually not

11  unusual").  The same month, Tetra Tech prepared attorney work product related to the draft reports

12  in anticipation of litigation.  Young Decl. ¶ 55, Ex. 62.

13      Thus, it is undisputed that more than two years before filing this lawsuit, not only had Tetra

14  Tech's work been suspended and its final payments withheld, Tetra Tech knew exactly why the

15  Navy had taken those actions, had copies of the draft reports, knew of the reports' preliminary

16  conclusions that Tetra Tech's data was suspect, knew Defendants had been involved in their

17  preparation, and had not only questioned the reports but anticipated litigation over them.

18      **F.**    **The Present Litigation**

19      On July 14, 2020, more than two years after the Navy's suspension of Tetra Tech's work

20  and withholding of final payments, and more than two years after Tetra Tech learned of the existence

21  and contents of the draft reports, Tetra Tech sued Defendants.  Dkt. No. 1.  In its original complaint,

22  Tetra Tech asserted negligence, negligent misrepresentation, and equitable indemnification based

23  on Defendants' evaluation of Tetra Tech's radiological remediation data.  *Id.*  After dismissal of

24  those causes of action (Dkt. No. 52), Tetra Tech amended its complaint, re-asserting the negligence

25  and equitable indemnity causes of action and adding causes of action for inducing breach of contract,

26  intentional interference with contractual relations, and violations of California's Unfair Competition

27

28  [5] The same month, in response to a reporter's inquiry, Tetra Tech prepared a statement challenging
the building report's findings.  Ex. 58 at SINGER_000492.

Law.  Dkt. No. 55.  Defendants again moved to dismiss.  Dkt. No. 59.

This Court disposed of all but two of Tetra Tech's causes of action:  those for inducing breach of contract and for intentional interference with contractual relations.  Dkt. No. 91. Defendants argued in their Motion to Dismiss that the cause of action for inducing breach failed because the only potential breach of contract suggested by the FAC within the applicable two-year limitations period was Tetra Tech's allegation that "[i]n December 2019, the Navy unilaterally suspended work on [CTO] 0007."  FAC ¶ 87.  Defendants explained that such a suspension could not constitute a breach given the Navy's inherent, implied right to terminate the contract at its convenience.  Dkt. No. 59 at 8.  The Court found that "[t]he success of [Defendants'] argument depend[ed] on the Court implying into Tetra Tech's contract with the Navy, a right by the Navy to 'terminate the contract at any time for any reason.'"  Dkt. No. 91 at 6.  Although Defendants cited generally applicable Federal Acquisition Regulations and the *Christian* doctrine[6] for the proposition that the government has termination-for-convenience rights in all federal contracts as a matter of law (Dkt. No. 59 at 8; Dkt. No. 64 at 5), the Court found that "no such provision is pleaded in the complaint and the contract itself is not before the Court on this pleadings motion."  Dkt. No. 91 at 6.  On that basis, the Court declined to dismiss the inducing breach of contract claim.  *Id.*

The Court applied similar reasoning to Tetra Tech's intentional interference cause of action. Defendants urged dismissal on the basis that Tetra Tech failed to plead an "independently wrongful act," a required element for interference causes of action based on at-will contracts.  Dkt. No. 59 at 8 (quoting *Ixchel*, 9 Cal. 5th at 1148); *see also* Dkt. No. 64 at 6.  Here, again, Defendants appealed to the *Christian* doctrine and the government's inherent, implied termination-for-convenience rights, but because the "at will" nature of the Navy's contract with Tetra Tech was "not plainly visible on the face of the complaint," the Court declined to dismiss the interference cause of action. Dkt. No. 91 at 7.  While the Court concluded this cause of action could "go forward," it did so "with

---

[6] "Pursuant to the *Christian* doctrine, 'a mandatory contract clause that expresses a significant or deeply ingrained strand of public procurement policy is considered to be included in a contract [under the FAR] by operation of law.'"  *Lee v. United States*, 130 Fed. Cl. 243, 258 (2017), *aff'd sub nom. Lee v. United States*, 895 F.3d 1363 (Fed. Cir. 2018) (citation omitted); *see generally G.L. Christian & Assocs. v. United States*, 312 F.2d 418, 426-27 (Ct. Cl. 1963).

1   the understanding that the 'at will' element, if established, may eventually warrant a dismissal." *Id.*

## III.   SUMMARY JUDGMENT STANDARD

Summary judgment should be granted where, as here, there "is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-24 (1986).  When the nonmovant has the burden of proof, the movant "can prevail merely by pointing out that there is an absence of evidence to support the nonmoving party's case."  *Soremekun v. Thrifty Payless, Inc.*, 509 F.3d 978, 984 (9th Cir. 2007). For a statute of limitations defense, the moving party discharges its initial burden by submitting evidence that the plaintiff's injury occurred outside the applicable limitations period.  *See, e.g.*, *Anagnostellis v. Pitney Bowes Inc.*, 2013 WL 8840335, at *2 (C.D. Cal. Mar. 5, 2013) (citing *In re Phenylpropanolamine (PPA) Prods. Liab. Litig.*, 167 F. App'x 662, 662 (9th Cir. 2006)).

"Once this initial burden of production has been met by the moving party, the burden then shifts to the nonmoving party to 'produce evidence to support its claim or defense.'"  *Winding Creek Solar LLC v. Peevey*, 293 F. Supp. 3d 980, 988 (N.D. Cal. 2017), *aff'd sub nom. Winding Creek Solar LLC v. Peterman*, 932 F.3d 861 (9th Cir. 2019) (quoting *Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1103 (9th Cir. 2000).  "This burden is not a light one.  The non-moving party must show more than the mere existence of a scintilla of evidence."  *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir. 2010).  A factual dispute will not defeat summary judgment unless it is both "material" and "genuine."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A dispute is material only if "[it] might affect the outcome of the suit under the governing law," and it is genuine only "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*

## IV.   ARGUMENT

Tetra Tech's two surviving causes of action are variations of the same cause of action for tortious interference with contract.  *See Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal. 3d 1118, 1126 (1990) (setting forth the required elements for such causes of action); *see 1-800 Contacts, Inc. v. Steinberg*, 107 Cal. App. 4th 568, 585 (2003) (inducing breach cause of action is "a species of intentional interference with contractual relations").  The two causes of action differ

in one material respect.  The inducing breach cause of action requires an actual breach of contract, while a disruption short of actual breach can be sufficient for the interference cause of action.  *See hiQ Labs, Inc. v. LinkedIn Corp.*, 31 F.4th 1180, 1191, n.9 (9th Cir. 2022) (cause of action for tortious interference with contractual relations may reach scenarios "where the plaintiff's performance has been prevented or rendered more expensive or burdensome").  Here, the indisputable evidence, the federal contracts at issue, and Tech Tech's own admissions establish that both causes of action are time-barred and fail on the merits as a matter of settled law.

### A.   Tetra Tech's Causes of Action Are Time-Barred

### 1.   The Statute of Limitations Expired by January 2020

Under California law, causes of action for tortious interference with contract are governed by the two-year statute of limitations in California Civil Procedure Code Section 339(1) for causes of action "founded upon a contract."  *See, e.g.*, *Trembath v. Digardi*, 43 Cal. App. 3d 834, 836 (1974); *Harmon v. Nelson*, 2022 WL 254344, at *7 (N.D. Cal. Jan. 27, 2022).  Section 339(1) supplies the date for when such causes of action begin to accrue: upon "the discovery of the loss or damage suffered by the aggrieved party thereunder."  *Id.*  Any "'actual and appreciable harm' . . . triggers the running of the limitations clock."  *Crowley v. Peterson*, 206 F. Supp. 2d 1038, 1047 (C.D. Cal. 2002).  A contractual interference cause of action therefore generally begins to accrue "at the date of the wrongful act," and in any event "no later than the date of the alleged breach of contract."  *Forcier v. Microsoft Corp.*, 123 F. Supp. 2d 520, 530 (N.D. Cal. 2000) ("Clearly, the accrual date could not be later than the actual breach of the contract by the party who was wrongfully induced to breach.") (quoting *Trembath*, 43 Cal. App. 3d at 836).

Here, Tetra Tech's causes of action are time-barred because the undisputed facts establish that both the alleged wrongful act (Defendants' preparation and publication of the draft reports to the Navy) and the alleged disruptions of the contract (the Navy's non-payment and suspension of Tetra Tech's work) occurred more than two years before Tetra Tech filed suit in July 2020.

Defendants' draft reports finding irregularities in Tetra Tech's data were dated between September 2017 and March 2018.  FAC ¶ 60.  The conduct that is alleged to have interfered with Tetra Tech's contractual relationship thus occurred entirely outside of the limitations period.

1   The harm allegedly triggered by Defendants' purported interference also occurred outside

2   the limitations period.  Tetra Tech alleges its contractual relationship with the Navy was harmed by

3   the Navy's refusal to pay invoices and by the Navy's suspension of its work.  FAC ¶¶ 83-87.  As to

4   the former category, the Navy withheld payment on Tetra Tech's final invoices beginning in 2017

5   and, by Tetra Tech's own admission, the alleged breach occurred no later than January 2018.  Ex.

6   23 at 10 (Supp. Resp. to Interrog. No. 7).  This admitted timing of the alleged breach falls six months

7   outside the applicable limitations period.  *See Forcier*, 123 F. Supp. 2d at 530.

8   The result is no different for the other form of alleged harm to Tetra Tech's contractual

9   relationship—the Navy's suspension of Tetra Tech's work.   Tetra Tech previously avoided

10  dismissal of its causes of action as time-barred based on its inaccurate allegation that the Navy did

11  not suspend its work on CTO 7 until December 2019.  Dkt. No. 91 at 6 (quoting FAC ¶ 87).  But

12  discovery has revealed that the Navy actually suspended Tetra Tech's work on CTO 7 on December

13  12, 2017 (Ex. 17), extended that suspension for another year in November 2018 (Ex. 21), and then

14  again in December 2019 (Ex. 22).   The December 2019 suspension was therefore not any new

15  disruption of the contract, but simply an extension of a prior suspension that began ***two years earlier***.

16  As a general proposition, "the statute of limitations attaches at once."  *Crowley*, 206 F. Supp.

17  2d at 1042 (quoting *Sonberg v. MacQuarrie*, 112 Cal. App. 2d 771 (1952)); *Vaca v. Wachovia*

18  *Mortg. Corp.*, 198 Cal. App. 4th 737, 745 (2011) ("The time bar starts running when the plaintiff

19  first learns of actionable injury, even if the injury will linger or compound.").   For tortious

20  interference causes of action specifically, continuing or ongoing harms do not restart or toll the two-

21  year statute of limitations.  *See, e.g.*, *Factory Direct Wholesale, LLC v. iTouchless Housewares &*

22  *Prods., Inc.*, 411 F. Supp. 3d 905, 918-19 (N.D. Cal. 2019) ("Plaintiff fails to cite—and the Court

23  has not found—a case that applied the California continuous accrual doctrine to tortious interference

24  claims."); *Nano-Second Tech. Co. v. Dynaflex Int'l*, 2013 WL 1855828, at *3 (C.D. Cal. May 1,

25  2013) ("[T]he theory of continuous accrual does not toll the statute of limitations for tortious

26  interference claims."); *DC Comics v. Pac. Pictures Corp.*, 938 F. Supp. 2d 941, 950 (C.D. Cal.

27  2013) (expressing "serious reservations" that continuing-wrong principles could ever apply to

28  causes of action for tortious interference with contract).  Because the December 2019 suspension

was a mere continuation of the suspension that began in December 2017, only the initial onset of the suspension in December 2017 matters for purposes of starting the limitations clock.

All of the disruptions allegedly induced by Defendants' draft reports therefore accrued by the end of January 2018, and the statute of limitations expired two years later, well before Tetra Tech filed suit on July 14, 2020.

### 2.  The Discovery Rule Does Not Save Tetra Tech's Causes of Action

Tetra Tech cannot avoid the consequences of its delay by asserting it "had no reason to be aware of Defendants' tortious conduct" when the Navy first suspended its work in 2017 or when it withheld payment on final invoices in January 2018 (and earlier).  Dkt. No. 63 at 3.  Under the plain text of Section 339(1), the causes of action accrued upon Tetra Tech's "discovery of the loss or damage" it allegedly suffered—*i.e.*, when it learned of the alleged breach and suspension—and Tetra Tech's awareness of Defendants' conduct is irrelevant.  *Cf. Rotiske v. Klemm*, 140 S. Ct. 355, 360 (2019) (atextual supplementation of legislatively-defined statutes of limitations is a "bad wine of recent vintage" (quotation omitted)).

But even applying the generic, common law discovery rule that Tetra Tech previously cited does not excuse Tetra Tech's delayed filing of this action.  The common law discovery rule does not allow a plaintiff to sit on its rights awaiting perfect knowledge of all the facts necessary to establish a cause of action.  Rather, under the common law rule, "the statute of limitations begins to run when the plaintiff *suspects or should suspect* that [its] injury was caused by wrongdoing,"—*i.e.*, "that *someone* has done *something* wrong to [it]."  *Jolly v. Eli Lilly & Co.*, 44 Cal. 3d 1103, 1110 (1988) (emphasis added).  Suspicion of one or more of the "generic elements of wrongdoing, causation, and harm" "will generally trigger the statute of limitations period" when "coupled with knowledge of any remaining elements."  *Fox v. Ethicon Endo-Surgery, Inc.*, 35 Cal. 4th 797, 807 (2005).  The statute of limitations thus does not wait for the plaintiff to "know the specific facts necessary to establish the cause of action."  *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 398 (1999) (internal quotations and alterations omitted).  Indeed, a plaintiff "may discover, or have reason to discover," a possible claim "even if he does not suspect, or have reason to suspect, the identity of the defendant."  *Id.* at 399; *see also Fox*, 35 Cal. 4th at 807 ("The discovery rule does not delay

1   accrual in that situation because the identity of the defendant is not an element of a cause of action.").

2   Nor does the discovery rule turn on the plaintiff's *actual* knowledge of the facts that might

3   give rise to a cause of action. *Fox*, 35 Cal. 4th at 807–08. Instead, the statute of limitations is

4   triggered as soon as the plaintiff has "notice or information of circumstances to put a reasonable

5   person *on inquiry*." *Norgart*, 21 Cal. 4th at 398 (emphasis in original, internal quotations omitted).

6   Accrual thus does not depend on when a plaintiff "personally" learned of key facts. *NBCUniversal

7   Media, LLC v. Superior Ct.*, 225 Cal. App. 4th 1222, 1234–35 (2014). Rather, plaintiffs are

8   "charged with knowledge of the information that would have been revealed" by a "reasonable

9   investigation" (*Fox*, 35 Cal. 4th at 808), meaning the statute of limitations begins to run, for

10  example, whenever "the cause of action could be ascertained from publicly available information"

11  (*NBCUniversal*, 225 Cal. App. 4th at 1235).

12  Here, by January 2018, the Navy had notified Tetra Tech it was withholding payment on the

13  final invoices for CTO 2, CTO 4, and CTO 12 due to "allegations that TtEC falsified data" while

14  "the validity of the data is reviewed and deliverables are verified." Ex. 15; *see also* Ex. 16. In the

15  same timeframe, the Navy had also notified Tetra Tech it had suspended its ongoing work under

16  CTO 7. Ex. 17. Also by January 2018, the unfavorable conclusions about Tetra Tech's work at

17  Hunters Point from the draft reports had entered into the public domain, and were brought to Tetra

18  Tech's attention. *See, e.g.*, Ex. 24; Ex. 27 (NBC Bay Area News, January 18, 2018); Ex. 33 (Curbed

19  SF, January 26, 2018); Ex. 34 (SF Gate, January 26, 2018); Ex. 35 (Business Insider, January 28,

20  2018); Ex. 36 (San Francisco Chronicle, January 30, 2018); Ex. 23 at 11-12 (Second Suppl. Resp.

21  to Interrog. No. 8). And while the law does not require Tetra Tech to have known the identity of

22  the entities involved in preparation of the draft reports for its causes of action to have accrued (*Jolly*,

23  44 Cal. 3d at 1110), that information, too, was in both Tetra Tech's direct possession and the public

24  record by January 2018. *See* Ex. 23 at 11-12 (Second Supp. Resp. to Interrog. No. 8) (Tetra Tech

25  received a copy of the draft report attached to Greenaction's NRC petition "[i]n or about January

26  2018"); Ex. 24 at TT_01462230 (identifying Defendants as the entities that "perform[ed] the

27  evaluation and confirmation investigation"); Ex. 33 (same).

28  All of this information was more than enough for Tetra Tech to "at least suspect" (*Fox*, 35

Cal. 4th at 807) it had a cause of action by January 2018, and certainly well in advance of July 2018: it knew of the withheld payments and suspension by the Navy; it knew the Navy's non-payment and suspension of work stemmed from its concern about data falsification; it knew that Defendants had been hired to investigate Tetra Tech's work; it knew the draft reports arose from that investigation; and it knew those reports' preliminary conclusions about its work at Hunters Point. In light of Tetra Tech's contention that its "data are reliable and [its] work at the Site was done correctly" (FAC ¶ 113), this information was more than sufficient to put Tetra Tech on at least inquiry notice to investigate whether Defendants' work might have induced the alleged disruptions of its contract with the Navy. *See, e.g.*, *Norgart*, 21 Cal. 4th at 405-06 (statute of limitations for wrongful death cause of action began to run as soon as decedent's parents began to "suspect[] [] 'something wrong' had happened to her to cause her death"); *R Power Biofuels, LLC v. Chemex LLC*, 2017 WL 1164296, at *13 (N.D. Cal. Mar. 29, 2017) (dismissing interference cause of action as untimely where "by Plaintiff's own allegations [its former subsidiary] had at least a suspicion of the cause of actions for tortious interference with contract").

Not only was Tetra Tech on inquiry notice to start investigating its causes of action as of January 2018, it *did* start to investigate. Its President made "several comments and notes" and purported to find "many holes in [the] draft report" on January 19, 2018. Ex. 25. Just days later, Tetra Tech asked the Navy for copies of any draft or final versions of reports assessing Tetra Tech's work at Hunters Point for the Navy. Ex. 28; *see also* Ex. 23 at 12 (Second Suppl. Resp. to Interrog. No. 8). By April 16, 2018 Tetra Tech had obtained copies of *all* the drafts and by May 2018—still outside the limitations period—the Navy had directly provided copies of the reports to Tetra Tech. Exs. 42-44; FAC ¶ 88. And, at that point, Tetra Tech had already begun challenging the draft reports' analyses and conclusions. Exs. 30-31 (internal taking points); Ex. 45 (client fact sheet); Ex. 49 at 1:39 (TT_01373550) (publicly stating during a press conference on April 25, 2018, "We have looked at the draft third-party reports that the Navy has prepared. We have a lot of questions about them."); Ex. 58 at SINGER_000492 (issuing statement on May 23, 2018 with specific critiques of draft building report); Ex. 59 at TT_01736075 (letter reiterating it disagrees with the reports' "technical methods, analyses, and findings"); Young Decl. ¶ 55, Ex. 62 (preparing work product).

Because Tetra Tech alleges it had already been injured by the Navy's suspension of work and non-payment, Tetra Tech could not "sit on [its] rights" after it was put on notice of the draft reports. *Jolly*, 44 Cal. 3d at 1111. Nothing can justify Tetra Tech's untimely filing more than two and a half years after it learned of the draft reports and began to question their conclusions. Defendants are therefore entitled to summary judgment on Tetra Tech's time-barred causes of action as a matter of law. *See, e.g.*, *id.* at 1112-13 ("[S]ummary judgment is proper" on statute of limitations grounds "where the uncontradicted facts established through discovery are susceptible of only one legitimate inference."); *Gonzales Commc'ns, Inc. v. Titan Wireless, Inc.*, 2005 WL 8173198, at *8 (S.D. Cal. July 11, 2005) (summary adjudication on tortious interference claim proper where plaintiff commenced suit "more than two years after the alleged interference began").

### B. Tetra Tech's Causes of Action Fail as a Matter of Law

In addition to being time-barred, Tetra Tech's causes of action fail as a matter of law, which supplies an independently sufficient basis for granting summary judgment in Defendants' favor.

#### 1. The Cause of Action for Inducing Breach Fails Because the Navy's Suspension Did Not Constitute a Breach of Contract

At the pleading stage, this Court relied upon Tetra Tech's allegations regarding the Navy's suspension of Tetra Tech's work in December 2019 to decline to dismiss Tetra Tech's cause of action for inducing breach. *See* Dkt. No. 91 at 6. Not only has discovery revealed that the suspension of work actually began two years earlier in 2017 (Ex. 17), it has confirmed that even if the suspension had begun in 2019, it was not a breach of contract. There is thus no predicate for an inducing breach cause of action within the limitations period.

In their Motion to Dismiss, Defendants argued the December 2019 suspension could not be the predicate for an inducing breach cause of action because the suspension was not a breach of contract. Dkt. No. 59 at 8. The Court was unable to credit Defendants' argument because "the contract itself [was] not before the Court on [Defendants'] pleading[] motion." Dkt. No. 91 at 6.

The Court now has that contract before it—as well as discovery responses showing that Tetra Tech does not consider the Navy's December 2019 extension of the suspension to have been a breach of contract. Following the Court's ruling on the Motion to Dismiss, CH2M served

interrogatories asking Tetra Tech to describe "all facts supporting [its] contention that the Navy breached its contracts with [Tetra Tech], as alleged in paragraphs 83 through 87 of the [FAC]." Ex. 23 at 9 (Interrog. No. 7). In response, the *only* "breaches" Tetra Tech identified were those that took place well outside the limitation period—the alleged breaches in January 2018 that occurred when the Navy withheld final payments for CTOs 2 and 4. *Id.* at 10 (Suppl. Resp. to Interrog. No. 7) ("On January 24, 2018, the Navy informed TtEC that it was refusing payment on invoices under Contract N62473-10-D-0809, Task Order 0002 and Contract N62473-12-D-2006, Task Order 0004 because of allegations of potential data manipulation and/or falsification.").[7]

Tetra Tech did not identify the Navy's continuation of the suspension of work in December 2019 as a breach of contract for good reason. For both the original suspension in December 2017 (Ex. 17) and the two extensions (Exs. 21-22), the Navy suspended Tetra Tech's work in accordance with the Navy's express rights to do so under the contract, and such exercise of the government's suspension rights cannot constitute a breach as a matter of law. As detailed above, the Navy's contract with Tetra Tech explicitly incorporates by reference FAR 52.242-14, the suspension-of-work provision. Ex. 1 (Contract N62473-10-D-0809, TT_00161479 at 525). That provision grants the Navy the right to "suspend, delay, or interrupt all or any part of the work of th[e] contract for the period of time that the Contracting Officer determines appropriate for the convenience of the Government." *See* 48 C.F.R. § 52.242-14. This language "allows the Government to exercise broad discretion to delay or suspend a contractor's work." *White Buffalo Const., Inc. v. United States*, 101 Fed. Cl. 1, 14 (2011), *aff'd in part, vacated in part, remanded by* 546 F. App'x 952 (Fed. Cir. 2013). Separately, the clause provides an exclusive remedy for any "unreasonable" suspensions: an adjustment under the contract if the contractor's costs of performance are increased as a result of an

---

[7] In addition to occurring outside the limitations period, Navy's withholding of final payments pending the DOJ's fraud investigation was not, in any event, a breach of contract. Executive agencies have no authority to settle, compromise, pay, or otherwise adjust any contract claim involving fraud. *See* 41 U.S.C. § 7103(c)(1); 48 C.F.R. § 33.210. Thus, "[g]overnment agencies have legal authority to withhold payment from a contractor of amounts which a Board determines to be due that contractor on a claim, in the nature of set-off, until issues of fraud have been disposed of by a court having jurisdiction over government claims for civil or criminal penalties." *Appeal of TDC Mgmt. Corp.*, DOTCAB No. 1802, 88-1 B.C.A. (CCH) ¶ 20,242 (Oct. 27, 1987).

1    unreasonable delay.  *See* 48 C.F.R. § 52.242-14(b).

2         The suspension-of-work provision serves "purposes highly important to the government as

3    well as to the contractor" by allowing to "keep the work going at all events, despite controversies

4    that may arise."  *Johnson & Sons Erectors,* 231 Ct. Cl. at 757.  By providing contactors with an

5    equitable adjustment remedy, the provision avoids contractors having to declare the contract in

6    breach and cease further performance in order to preserve their rights.  *Id.*  The upshot of the

7    suspension-of-work provision is that "[w]hat would otherwise be breaches are converted into claims

8    for equitable adjustment."  *Id.*  In other words, the suspension-of-work provision eliminates any

9    government liability for breach of contract arising from a suspension of work.  *Id.* at 759 ("[A] claim

10   remediable under a contract clause" giving the government the right to suspend the contract "is not

11   a breach and cannot be remediable as a breach."); *see also Louis Leustek & Sons, Inc. v. United*

12   *States*, 41 Fed. Cl. 657, 667 n.7 (1998), *aff'd,* 215 F.3d 1347 (Fed. Cir. 1999) ("The government has

13   implemented provisions such as the suspension of work clause in its contracts 'in order to avoid

14   liability for breach of contract when effecting contract modifications, which inevitably arise.'")

15   (citation omitted); *Broome Const., Inc. v. United States,* 203 Ct. Cl. 521, 529-30 (1974) (granting

16   summary judgment to government on plaintiff's causes of action alleging that government's

17   suspension of work breached the contract because "[d]efendant is fully entitled to enforce its rights

18   as set forth in the contract.  The contract reserved the right to suspend work without defendant's

19   being liable for costs arising from attendant delay.  Plaintiff agreed to such terms.  The court must

20   enforce a mutually agreed-upon contract according to its terms."); *Triax-Pac. v. Stone,* 958 F.2d

21   351, 354 (Fed. Cir. 1992) (any suspension of work by the government is remediable if at all under

22   the FAR's suspension-of-work clause in the contract, "not as a breach of [] contract [claim].").

23        Because the government's extension of the suspension of Tetra Tech's work in December

24   2019 was "well within the ambit of the suspension of work clause," "[s]uspending [Tetra Tech's]

25   performance of the work did not constitute a 'breach of contract'," and Tetra Tech's remedies, if

26   any, are limited to seeking a price adjustment from the government pursuant to the contract.

27   *Holloway Const. Co. v. United States,* 4 Cl. Ct. 779, 788 (1984).  The Navy's December 2019

28   extension of its prior suspension of Tetra Tech's work under CTO 7 thus cannot supply a predicate

breach for purposes of Tetra Tech's cause of action.  *See, e.g.*, *John A. Johnson & Sons, Inc. v. United States*, 180 Ct. Cl. 969, 990-91 (1967) (government's de facto suspension of work "was no breach of the contract" given suspension-of-work clause in the contract); *Appeal of D.H. Dave & Gerben Contracting Co.*, ASBCA No. 6257, 1962 B.C.A. (CCH) ¶ 3943 (Aug. 30, 1962) (suspending work under contract containing suspension-of-work clause did "not amount to breaches of contract as the Government had a right to suspend the work for a reasonable time, without liability"); *T.C. Bateson Const. Co.*, ASBCA No. 5492, 60-1 B.C.A. (CCH) ¶ 2552 (Mar. 16, 1960) ("[A] suspension of work caused by the Government is not a breach of contract when done pursuant to a right granted to the Government by the terms of the contract itself."); *cf. C.E. Servs., Inc. v. Control Data Corp.*, 759 F.2d 1241, 1248 (5th Cir. 1985) ("A third-party's efforts to induce another to exercise his right to dissolve a contract at will or to terminate contractual relations on notice does not constitute tortious interference"; "exercis[ing] . . . rights of termination as provided for in . . . contracts" is not a breach).  Because Tetra Tech has not identified any other viable breach within the limitations period (*see supra* at 16), the Court should grant summary judgment for Defendants on the inducing breach cause of action.

### 2.   The Intentional Interference Cause of Action Fails Because Tetra Tech Does Not and Cannot Identify Any Independently Wrongful Act

Tetra Tech's cause of action for interference with contractual relations likewise fails on the merits as a matter of law, in addition to being time-barred.  Tetra Tech cannot show any independently wrongful act by Defendants, which is an essential element of the cause of action given the at-will nature of the underlying contracts.

In *Ixchel Pharma, LLC v. Biogen, Inc.*, 9 Cal. 5th 1130 (2020), the California Supreme Court held that causes of action for interference with an at-will contract are akin to causes of action for interference with prospective economic advantage and subject to the same requirements. *Id.* at 1147 ("Like parties to a prospective economic relationship, parties to at-will contracts have no legal assurance of future economic relations.").  Given the lack of any legal right to the continuation of an at-will contract, mere interference with such a contract is insufficient to give rise to a cause of action.  Rather, to make out a cause of action for interference with such a contract, a plaintiff must

1  allege and ultimately prove "that the defendant engaged in an independently wrongful act." *Id.* at

2  1148.  To satisfy this requirement, the plaintiff must show the defendant interfered with the contract

3  through some unlawful act that is "proscribed by some constitutional, statutory, regulatory, common

4  law, or other determinable legal standard."' *Id.* at 1142 (citation omitted).  In other words, a plaintiff

5  must show the defendant's conduct was "wrongful by some legal measure other than the fact of

6  interference itself," *id.*, and the interference must "amount[] to independently actionable conduct,"

7  *Korea Supply Co. v. Lockheed Martin Corp.*, 29 Cal. 4th 1134, 1158-59 (2003).  As the California

8  Supreme Court has explained, this important requirement avoids "chilling legitimate business

9  competition." *Ixchel Pharma,* 9 Cal. 5th at 1148 ("Allowing disappointed competitors to state

10  claims for interference with at-will contracts without alleging independently wrongful conduct may

11  expose routine and legitimate business competition to litigation.").  Tetra Tech's multiple failed

12  attempts to plead independent unlawfulness—*i.e.*, its previously dismissed negligence, negligent

13  misrepresentation, equitable indemnification, and UCL causes of action—demonstrate that it cannot

14  establish this essential element of its cause of action.

15      In opposing Defendants' argument in the Motion to Dismiss that the government's at-will

16  termination right is part of every federal procurement contract as a matter of law, Tetra Tech

17  represented to this Court that "an at-will contract . . . is not at issue here." Dkt. No. 91 at 7 (quoting

18  Dkt. No. 63 at 7).  The actual contracts, which are now in the record before the Court, contradict

19  Tetra Tech's prior representation.  As outlined above, the two contracts under which the relevant

20  CTOs were issued both contain the standard FAR termination-for-convenience clauses as required

21  by law.  Ex. 1 at TT_00161525 (incorporating FAR 52.249-1 and FAR 52.249-2); Ex. 2 at

22  TT_00160314 (incorporating FAR 52.249-2 and FAR 52.249-4).  These clauses give the Navy the

23  unilateral right to terminate "if the Contracting Officer determines that a termination is in the

24  Government's interest."  FAR 52.249-2; *see also* 52.249-1, 52.249-4.  The "broad reach of" this

25  language "comprehends termination in a host of variable and unspecified situations calling (in the

26  contracting officer's view) for the ending of the agreement." *John Reiner*, 163 Ct. Cl. at 390; *see*

27  *also Boarhog LLC v. United States*, 129 Fed. Cl. 130, 134 (2016) ("The Government has

28  considerable latitude to terminate a contract for convenience and may exercise its right to do so

1   unilaterally."). Courts have expressly held that under this "all-inclusive" termination-for-

2   convenience clause, "the Government has the right to terminate 'at will.'" *Reiner*, 163 Ct. Cl. at

3   390; *Madera Irr. Dist. v. Hancock*, 985 F.2d 1397, 1405 (9th Cir. 1993), as amended (March 8,

4   1993) (recognizing federal "termination for convenience" clauses in contracts as "permit[ting]

5   government to terminate a contract at will").

6          Tetra Tech accordingly had no legal assurance of ongoing contractual relations with the

7   Navy and therefore must satisfy *Ixchel*'s independent wrongfulness requirement to have a viable

8   cause of action for tortious interference. The Court has already rejected Tetra Tech's attempts to

9   plead negligence and other independently actionable conduct. *See* Dkt. No. 52; Dkt. No. 91. Aside

10  from these already-rejected claims, the FAC does not even attempt to allege the preparation and

11  publication of the draft reports to the Navy is "wrongful by some legal measure other than the fact

12  of interference itself," *Ixchel*, 9 Cal. 5th at 1142, or that the interference "amounts to independently

13  actionable conduct," *Korea*, 29 Cal. 4th at 1158-59. Nor did Tetra Tech identify any purported

14  independently wrongful acts in its discovery responses. *See* Ex. 23 at 7 (Supp. Resp. to Interrog.

15  No. 4). There is thus no cognizable basis for the independent wrongfulness required to establish a

16  cause of action for interference with an at-will contract. *See, e.g.*, *All Am. Healthcare Servs., Inc.*

17  *v. Beecan Health CT, LLC*, 2023 WL 4676850, at *5 (C.D. Cal. June 23, 2023) (dismissing tortious

18  interference cause of action because plaintiff did not plead an independently wrongful act).

19         With the contracts containing the mandatory termination-for-convenience provisions now in

20  the record before the Court, judgment in Defendants' favor is warranted on the intentional

21  interference cause of action, as this Court has already recognized. *See* Dkt. No. 91 at 7 (declining

22  to dismiss the interference cause of action on the pleadings because the contract was not in the record

23  but acknowledging that "the 'at-will' element, if established, may eventually warrant a dismissal").

24  **V.   CONCLUSION**

25         For over three years, Defendants have had to defend against causes of action Tetra Tech filed

26  outside of the statute of limitations and without adequate legal foundation, all in an effort to shield

27  itself from the fallout of a scandal of Tetra Tech's own making. Defendants respectfully request

28  that the Court grant summary judgment in their favor and put this lawsuit to rest.

1   DATED:  August 31, 2023              MUNGER, TOLLES & OLSON LLP

2

3                                        By:      /s/ Blanca F. Young

4                                               BLANCA F. YOUNG
                                         Attorneys for Defendant CH2M HILL, INC.
5

6   DATED:  August 31, 2023              DAVIS WRIGHT TREMAINE LLP

7

8                                        By:      /s/ Joesph E. Addiego III

9                                               JOSEPH E. ADDIEGO III
                                         Attorneys for Defendant BATTELLE MEMORIAL
10                                       INSTITUTE

11
    DATED:  August 31, 2023              FURUKAWA CASTLES LLP
12

13

14                                       By:      /s/ Bruce Furukawa

15                                              BRUCE FURUKAWA
                                         Attorneys for Defendant CABRERA SERVICES, INC.
16

17  DATED:  August 31, 2023              BASSI EDLIN HUIE & BLUM LLP

18

19                                       By:      /s/ Erin K. Poppler

20                                              ERIN K. POPPLER
                                         Attorneys for Defendant PERMA-FIX
21                                       ENVIRONMENTAL SERVICES, INC.

22
    DATED:  August 31, 2023              ZELMS ERLICH & MACK
23

24

25                                       By:      /s/ Rinat Erlich

26                                              RINAT ERLICH
                                         Attorneys for Defendant SC&A, INC.
27

28

**Attestation re: Electronic Signatures**

I, Blanca F. Young, attest pursuant to Northern District Local Rule 5-1(i)(3) that all other signatories to this document, on whose behalf this filing is submitted, concur in the filing's content and have authorized this filing. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

DATED:  August 31, 2023                    MUNGER, TOLLES & OLSON LLP


By:    /s/ Blanca F. Young
       BLANCA F. YOUNG
       Attorneys for Defendant CH2M HILL, INC.

DEFENDANTS' CORRECTED MOTION FOR SUMMARY JUDGMENT